**J. Thomas ALLISON III and Rebecca S. Allison, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**James E. Dorsey and Maurine M. Dorsey, Plaintiffs,**

**v.**

**The United States, Defendant.**

**Sidney Olansky and Marian Olansky, Plaintiffs,**

**v.**

**The United States, Defendant.**

**Nos. 99–419T, 99–726T, 98–718T.**

United States Court of Federal Claims.

Feb. 27, 2008.

Stuart A. Smith, New York City, for plaintiffs.

David R. House, Tax Division, Department of Justice, with whom were Eileen J. O'Connor, Assistant Attorney General, Mildred L. Seidman, Chief, Court of Federal Claims Section, and William K. Drew, all of Washington, D.C., for defendant.

## OPINION AND ORDER

WOLSKI, Judge.

These three cases concern negligence penalties imposed on taxpayers under the former section 6653 of the Internal Revenue Code. The plaintiffs in each case seek refunds of these penalties, paid because deductions and credits they claimed on their taxes stemmed from investments in what was ultimately determined to be an abusive tax shelter. The Court consolidated these cases for purposes of conducting a trial, which was held over

two days in Atlanta, Georgia.[1] After conclusion of the trial, the plaintiffs (jointly) and the government submitted thorough post-trial briefs. This opinion comes after a careful consideration of the briefs, the testimony and the other evidence introduced at trial.

## I. BACKGROUND

In December 1982 the plaintiffs in these three cases, J. Thomas Allison III, James E. Dorsey, and Sidney Olansky, each purchased interests in a limited partnership known as Masters Recycling Associates ("Masters").[2] This partnership was purportedly established to place plastics recycling machines with businesses generating polystyrene scrap in order to recycle the scrap into a reusable form of resin pellets. The plaintiffs purchased the Masters interests under the advice of investment manager Marc Heilweil and certified public accountant Robert Wilensky, who worked together on the matter. Pursuant to a February 23, 1994 decision of the United States Tax Court, the Internal Revenue Service ("IRS") readjusted Masters' partnership items for the taxable years 1982 to 1985. Def's Ex. 5.

As a consequence, the energy and investment tax credits claimed by the plaintiffs based on machines leased by Masters, and their deductions for losses generated by Masters, were disallowed and the IRS assessed varying amounts of federal income taxes, interest, and penalties against the plaintiffs. The trial concerned the negligence penalties imposed under the authority of 26 U.S.C. § 6653(a), as it existed and applied to the tax years in question.[3] That section authorized a penalty when "any part of any underpayment" of certain taxes was "due to negligence or intentional disregard of rules or regulations...." 26 U.S.C. § 6653(a)(1) (1983). The plaintiffs challenge the government's imposition of the penalty for negligence, maintaining that their investigations into the economic prospects and the tax consequences of the Masters partnership and reliance in good faith on the advice of competent professionals met the applicable standard of care. Pls.' Post–Trial Brief ("Pls.' Br.") at 27–43. The government, on the other hand, argues that the plaintiffs inadequately investigated the merits of the business, unreasonably relied on advisers who lacked expertise in the subject matter of the investment and who were conflicted due to self-interest, and should have been suspicious of tax benefits of the size promised by Masters. Def.'s Post–Trial Brief ("Def.'s Br.") at 16–26.

To place its findings and conclusions within the proper context, the Court will first review the Masters investment opportunity and provide a brief overview of the litigation concerning the abusive tax shelter nature of the plastics recycling investment vehicles—of which Masters was one example. Some background information is then provided for the plaintiffs and their witnesses, before turning to a discussion of the applicable law and the findings and conclusions resulting from the trial.

### A. Masters Recycling Associates

In November 1982, Masters issued a Private Offering Memorandum ("Memorandum") seeking to raise $900,000 by selling eighteen limited partnership units at a price of $50,000 per unit.[4] Pls.' Ex. 1. The $900,000 would in turn be used primarily for the prepayment of rental fees for four Sentinel EPS Recyclers the partnership was to

---

1. The trial was also to include *Ridley v. United States*, No. 98–647T, but that case was dismissed with prejudice by agreement of the parties.

2. Plaintiffs Rebecca Allison, Maurine Dorsey, and Marian Olansky were not investors or partners in the partnership, and are parties to this suit solely because they filed joint returns with their husbands for the years in question.

3. The plaintiffs in each case initially also sought a refund of the additional taxes imposed due to the disallowed deduction and credits, the penalty interest imposed under 26 U.S.C. § 6621(c), and

the valuation overstatement penalties imposed under 26 U.S.C. § 6659. *See Olansky v. United States*, Compl. ¶¶ 39–61; *Allison v. United States*, Compl. ¶¶ 33–53; *Dorsey v. United States*, Compl. ¶¶ 33–54. These other issues have been conceded by the taxpayers. *See Olansky v. United States*, Jt. Prelim. Stat. Rpt. ¶ h; *Allison v. United States*, Jt. Prelim. Stat. Rpt. ¶ h; *Dorsey v. United States*, Jt. Prelim. Stat. Rpt. ¶ h.

4. Prospective partners could purchase less than a whole unit. Pls.' Ex. 1 at 5.

lease, and for associated administrative costs. *Id.* at 15.[5] Among the administrative costs identified were purchaser representative fees, a ten percent commission on the sales of units or fractional interests to be paid to investors' investment advisers.[6] *Id.* at 6, 15. The stated objectives of the partnership were "to earn profits through the operation of the Sentinel EPS Recyclers and to make cash distributions to the Limited Partners to the extent that such cash is not needed for working capital or payment of contractual obligations." *Id.* at 1. Attached to the Memorandum were several appendices, including financial projections, a legal opinion letter drafted for the general partner (Samuel L. Winer), and evaluation reports written by two professors. *See id.* at Apps. D–F.

The Memorandum detailed how the partnership would come to lease the four machines, and through a joint venture would employ them to recycle expanded polystyrene scrap into resin pellets which could be sold for a profit. *See id.* at 20–23. After the machines were manufactured by Packaging Industries Group, Inc. ("PI"), they were to pass through the hands of two corporations before being leased by the partnership. The first purchaser was Ethynol Cogeneration, Inc. ("ECI"), a New York corporation formed in November of 1980. Pls.' Ex. 1 at 6, 20. The second purchaser was F & G Equipment Corp. ("F & G"), a Delaware corporation as of September 1, 1982. *Id.* at 5, 20. F & G was wholly-owned by eleven effectively-equal[7] shareholders, and several of these shareholders had interests which potentially conflicted with the interests of Masters.[8] *Id.* at 18, 20. ECI was wholly-owned by Raymond Grant, a former shareholder in F & G and a long-time business associate of several F & G shareholders. *Id.* at 18, 20.

Masters was to lease the recyclers from F & G. *Id.* at 5, 21. The partnership was then to enter into a joint venture with PI and Resin Recyclers Inc. ("RRI") for the placement and operation of the recyclers, the further processing of the material produced by the recyclers (called "Extrudate") into resin pellets, and the sale of the resulting pellets. *Id.* at 21–22. RRI was a recently-organized Massachusetts corporation wholly-owned by Robert Gottsegen, a business associate of the president and controlling shareholder of PI. Pls.' Ex. 1 at 18, 24. Neither PI nor RRI had any experience in using or selling the resin pellets that resulted from the recycling process. *Id.* at 9.

The Memorandum described the various transactions as follows:

> ECI will purchase the Sentinel EPS Recyclers from PI for $6,080,000, of which $451,000 is payable by ECI to PI at closing and the balance of $5,629,000 is payable by ECI's delivery to PI of a 12–year nonrecourse collateral promissory note.... The ECI Note will require payments in equal monthly installments of $81,250 each to maturity.... F & G will purchase the Sentinel EPS Recyclers from ECI pursuant to a Purchase and Security Agreement.... F & G will pay ECI an aggregate of $7,000,000 for the Sentinel EPS Recyclers, of which $513,000 will be paid in cash at closing and the balance of $6,487,000 will be paid by delivery of F & G's 12–year partial recourse collateral promissory note.... The F & G Note requires payment in equal monthly installments of $81,250 each to maturity.... F & G will lease the Sentinel EPS Recyclers to the Partnership ... for a term of 9½ years.... The Partnership will pay F & G

---

**5.** Masters was to start with $901,000, as the general partner also contributed $1,000 and received a one percent interest in the partnership. Pls.' Ex. 1 at 5, 15, 18.

**6.** The Memorandum stated that a "purchaser representative must have sufficient knowledge and experience in financial matters to enable him either alone or together with the purchaser and/or other purchaser representatives of the purchaser, to evaluate the merits and risks of an investment in the Partnership by the purchaser." Pls.' Ex. 1 at 17.

**7.** All but one of the shareholders held a 9.1 % interest in the company, and the other held a 9.0 % interest. Pls.' Ex. 1 at 20.

**8.** For instance, Elliot Miller, a 9.1 % interest shareholder in F & G Corp., was also general counsel to, *inter alia*, PI, Masters' general partner, the president of F & G Corp., several F & G Corp. shareholders, and Dr. Samuel Burstein (one of the evaluators). Pls.' Ex. 1 at 18.

a monthly base rent of $81,250.... PI will pay the Partnership a joint venture fee ... of $81,250 per month ...

*Id.* at 20–22.[9] Each of the monthly payments was to begin nine months after closing, except that Masters was to pay F & G $650,000 at closing to prepay the first eight months of rent. *Id.* Masters was also to pay F & G additional rent in the amount of twenty-five percent of its profits under the joint venture, described below. *Id.* at 21.

Under the business plan described in the Memorandum, the partnership would exploit the leased machines through the joint venture with PI and RRI. Under this joint venture, RRI would assist Masters in placing the machines with "End Users," which were to be businesses which either manufactured steam chest molded expanded polystyrene and produced scrap as a by-product, or accumulated such scrap in the form of packing and cushioning materials used in the shipments of goods received. *Id.* at 5, 22. In addition to contributing the monthly joint venture fee of $81,250, and a $25,000 "advance minimum profit," PI was to ship, install, service, repair, and insure the machines. Pls.' Ex. 1 at 21–22.[10] It was envisioned that end users would be paid a recycling fee for providing the scrap materials processed by the recyclers. *Id.* at 22. The Memorandum stated PI and RRI would be responsible for:

(a) inbound transportation of the Extrudate to the Pelletizing sites, (b) paying the recycling fee to End Users, (c) providing the facilities necessary to grind and toll (extrude) the Extrudate in a timely manner, (d) grinding the Extrudate, (e) purchasing and mixing the additive, (f) extruding this mixture into resin pellets and (g) arranging for sale of the pellets produced.

*Id.* End users were to load their expanded polystyrene scrap into the recyclers, which would chop up, compress, heat and "density" this material into a liquid polystyrene that is twenty to forty times the density of the input scrap material. *See id.* at 19–20. The solidified Extrudate would then be taken by PI and RRI to be further ground up, converted into resin pellets, and sold to manufacturers requiring this material. *Id.* at 22.

The Memorandum projected that Masters would turn a profit through the sale of the resin pellets produced from the expanded polystyrene scrap. *Id.* at 22–23. The recyclers were expected to process an average of 1,872,000 pounds of expanded polystyrene scrap per year. *Id.* at 23. It was assumed that one-hundred percent of the average amount of scrap processed could be turned, pound for pound, into resin pellets. *See* Pls.' Ex. 1 at 23. The Memorandum then projected the profits Masters would receive from the sale of the pellets. Under the joint venture, in the initial year of the venture the first $0.27 from the sale of each pound of resin pellets was to be paid to PI and RRI as a fixed fee covering reimbursed costs—an amount which, in each succeeding year, would increase by fifty percent of any rise in the price of resin pellets over a base price. *Id.* at 22.[11] The next $0.10 of each pound of pellets sold was to be distributed to Masters as joint venture profits, twenty-five percent of which was to be paid to F & G as additional rent. *Id.* at 22–23. If the pellets sold for more than $0.37 per pound (plus the increase in reimbursed costs after year one), a brokerage commission of up to five percent could be paid to PI and RRI. *Id.* at 22. Any remaining profits would be split between Masters and the other two parties to the joint venture, with Masters receiving seventy-five percent of this amount and PI and RRI sharing the other twenty-five percent.

---

9. The full recourse portion of the partial recourse note that F & G gave ECI was to be satisfied only after the nonrecourse portion of the note was satisfied. Pls.' Ex. 1 at 21. The full recourse portion was for twenty percent of the principle. *Id.* The ECI note was secured by a first lien on the recyclers, and the F & G note by a second lien. *Id.* at 20.

10. The "advance minimum profit" did not figure in the calculation of the additional rent payments owed to F & G under the lease. *See* Pls.' Ex. 1 at 21.

11. The "Base Price" was defined as "the price at the low end of the range of prices appearing in the latest *Chemical Marketing Reporter* for general purpose polystyrene pellets in packaged truckloads." Pls.' Ex. 1 at 22.

*Id.*[12]

Although polystyrene resin pellets were selling within a price range of $0.45 to $0.47 per pound in bulk sales (and an additional $0.025 per pound for smaller units) at the time the Memorandum was issued, *see id.* at 9, the projected profits were calculated by starting with just the initial $0.10 per pound of joint venture profits due Masters. Pls.' Ex. 1 at 23, D–5. This, then, was the equivalent of assuming an initial price of just $0.37 per pound. To this amount. was applied a factor equal to "an 11% compounded, average annual increase in the market price of virgin pellets" throughout the life of the joint venture. *Id.* Based on these assumptions, the Memorandum projected that Masters would return a profit (net of additional rent payments made to F & G) of $2,873,144 over the nine and one-half year course of the venture. *See id.* at 23, D–4. This worked out to a nominal total (not discounted to present value) of $158,023 in projected net joint venture profits per each $50,000 unit. *Id.* at D–4.

In addition to stating in several places the profit objectives and projections, *see, e.g., id.* at 1, 5, 14, 23, the Memorandum also described the tax benefits associated with an investment in Masters. The Memorandum stated that:

> For each full Unit purchased the investor will receive regular investment and energy tax credits and tax deductions in 1982, as follows:

| | Payment | Projected Regular Investment and Energy Tax Credits | Projected Tax Deductions |
|---|---|---|---|
| 1982 | $50,000 | $77,000 | $38,940 |

Pls.' Ex. 1 at 23; *see also id.* at 6, D–3. Thus, the first year tax benefits projected per unit, assuming a fifty percent tax bracket,[13] amounted to $96,470 ($77,000 in credits, plus a deduction resulting in tax savings of fifty percent of $38,940, or $19,470). *See id.* at D–3. Additional tax savings totaling $1,224 were expected to be produced from deduc-

tions taken over the following five years of the investment. *See id.* The Memorandum explained that, wholly apart from the results of any IRS audit, the tax credits were not a certain thing. *See id.* at 13. The "recapture" of all or a portion of these credits was described as a possible result, were the recyclers to be disposed of, or the partnership discontinued, within five years of the date the machines were purchased by F & G. *Id.; see also id.* at E–10–11.

In addition to describing Masters' general business plan and tax benefits, the Memorandum listed significant business and tax risk factors associated with an investment in Masters. Pls.' Ex. 1 at 8–13. Among other things, the Memorandum stated that there was a "substantial likelihood that the Service will audit the federal income tax returns filed by the Partnership and each Limited Partner" and that "the purchase price of the Sentinel EPS Recyclers to be paid by F & G to ECI may be challenged ... as being in excess of fair market value," *id.* at 12; that the partnership had "no operating history," *id.* at 8; that the general partner had "limited experience in marketing recycling or similar equipment," *id.;* that the limited partners had no control over the conduct of the partnership business, *id.;* that there was "no established market for leasing or operating the Sentinel EPS Recyclers or comparable recycling equipment," *id.* at 9; that there could be no assurances that market prices for virgin resin would remain at their current costs per pound, or that the recycled pellets would be as marketable as virgin pellets, Pls.' Ex. 1 at 9; and that "[t]here are potential conflicts of interest." *Id.* at 10. The risk of PI failing to pay the monthly joint venture fee, without which the lease payments would not be possible, was also discussed. *Id.* at 8. To prevent such an occurrence from triggering a default, F & G agreed to defer enforcing its rights to collect overdue lease payments for six years from the date the lease

---

12. As has been noted, Masters would then have to pay twenty-five percent of its share of these profits to F & G as additional rent under the lease. Pls.' Ex. 1 at 21.

13. Investment in Masters was limited to "qualified investors." Pls.' Ex. 1 at 1. In order to be a qualified investor, one had to satisfy at least one

of the following requirements: "(a) have a net worth ... in excess of $1,000,000 ... (b) have income during each of the two most recent years in excess of $200,000 ... or (c) be an entity in which all of the equity owners qualify individually under (a) or (b)." *Id.* at 5.

agreement became effective, whenever PI's default was the cause. *Id.; see also id.* at B–2 (¶ 2(d) of Equipment Lease Agreement). The notes given by ECI and F & G were to contain similar deferrals. *Id.* at 8, 20–21. Prospective investors were told not to consider the Memorandum to constitute expert advice, and to consult their own professional advisers regarding legal, tax, business, and accounting issues. Pls.' Ex. 1 at 2.

The Memorandum also discussed PI and its product, the Sentinel EPS Recycler, in some detail. PI was a Massachusetts-based Delaware corporation, which at that time had been in business for nearly forty years. Pls.' Ex. 1 at 24. The business manufactured blister packaging machinery, thermoforming machinery, and a variety of foam products and energy-saving devices. *Id.* According to one evaluator, PI was "the world's largest manufacturer of blister packaging machinery" and "the most complete supplier of packaging and cushioning products in the country." *Id.* at F–3. The Sentinel EPS Recycler was "designed, engineered and manufactured specifically for the purposes of ECI," *id.* at 8, and PI had "granted ECI a right of first refusal with respect to" such equipment. *Id.* at 10. Rather than patent its inventions, PI followed a policy of protecting its trade secrets, *see id.* at F–4, and accordingly did not transfer to Masters the rights to the trade secrets embodied in the Sentinel EPS Recycler. Pls.' Ex. 1 at 6.

PI had informed the partnership that no steam chest molded expanded polystyrene recycling equipment comparable to the Sentinel EPS Recycler was in existence at that time. Pls.' Ex. 1 at 10. PI was aware of one machine that could densify this scrap material for disposal, but which did "not produce a material capable of further processing into a useable or marketable product." *Id.* RRI informed Masters that it was "aware of a Danish line of equipment" which was not comparable to the Sentinel EPS Recycler, as the recycled product proved heavily defective and the machines could not be used by end users to process packing materials. *Id.* In light of the alleged lack of any comparable machines or an established market for their use, PI represented that it "priced the Senti-

nel EPS Recyclers in a manner consistent with its historical pricing methods for proprietary machines." *Id.* at 12.

The attached reports of the two evaluators engaged by F & G supported some of the statements contained in the Memorandum. The first report was a marketing report authored by Stanley M. Ulanoff, a marketing consultant and professor. *See id.* at F–1–8. Doctor Ulanoff by that time had been a professor of marketing for eighteen years, had advised the energy industry and the United States Department of Defense, and had previously worked for a decade as a partner in a business that sold and distributed "packaging materials, including plastic film and expanded foam products." Pls.' Ex. 1 at F–2. He was also in the process of "writing a research paper, under a grant from the prestigious Marketing Science Institute ... dealing with the subject of economic shortage and the recycling of scarce commodities and resources." *Id.*

In his report, Dr. Ulanoff noted that Mr. Gottsegen, president and sole owner of RRI, headed "several companies in the business of steam chest molding expanded polystyrene and has extensive knowledge of manufacturers and consumers" of such products. *Id.* at F–3. Doctor Ulanoff listed several Fortune 500 companies which purchased machinery from PI and detailed the efforts taken by PI to protect trade secrets. *Id.* at F–4. In his report, he was enthusiastic about the business prospects of the plan to convert steam chest molded expanded polystyrene waste into a reusable form of resin pellets. *See id.* at F–4–7. He based this assessment on the increasingly expensive need to dispose of thermoplastic foam scrap, which takes up a large amount of space, and the continuing demand for plastics products. Pls.' Ex. 1 at F–5. He noted an article from the *Chemical Marketing Reporter* indicating "the anticipated rise in prices of polystyrene resin pellets." *Id.*

Doctor Ulanoff also noted the conservative nature of the economic projections for the partnership, "since the low end of the range of the current price for the resin pellets is $.45 per pound," and the projections assumed that the partnership would initially earn prof-

its based on a $0.37 per pound sales price. *Id.* at F–7. He found the projected annual increase in the price of pellets "very reasonable ... given the history of the plastics industry and especially this segment of it." *Id.* Doctor Ulanoff stated that his investigations included "discussions with key personnel of PI and RRI and other nonrelated principals in the packaging and plastic industries and editors of plastics trade journals." *Id.* at F–8. He concluded, among other things, that "the price to be paid by F & G for the Recyclers, [ ] the rent to be paid by the Partnership, and [ ] the joint venture profits anticipated to be received by the Partnership and F & G, are fair and reasonable." *Id.* Doctor Ulanoff represented that, in reaching these conclusions concerning the reasonableness of the purchase and rent prices, he had "not considered the dollar savings to the Partnership attributable to the regular and energy investment tax credits." Pls.' Ex. 1 at F–7.

The second evaluator report was a technical opinion by Samuel Z. Burstein, a New York University mathematics professor with a mechanical engineering background. *See* Pls.' Ex. 1 at F–9–24. Doctor Burstein's experience included consulting with the United States Department of Energy (and its predecessor) since 1964. *Id.* at F–10. In addition to noting the high cost of disposing of foam plastic waste, *id.* at F–14, and the "significant rejection rate (5% to 15%)" of steam chest expanded polystyrene molding, *id.* at F–19, the report discussed the ability of the Sentinel EPS Recycler to process this waste. *See id.* at F–21–23. Doctor Burstein stated that "[a]t the present time, other than the PI Sentinel EPS Recycler, there is no recycling machine which will take steam chest molded expanded polystyrene and create a nonburnt (uniform polymer molecular weight and structure) extrudate with economic value." Pls.' Ex. 1 at F–21. The report discussed a Japanese machine which produced degraded materials that were only suitable as an additive to asphalt. *Id.* The report concluded that the PI machine "yields a material which

has commercial value" based on the properties of the resulting pellets. *Id.* at F–23. Doctor Burstein opined that the machine "uniquely achieves the following goal: the characteristics of the polystyrene polymer have been successfully conserved under the densification process." *Id.* at F–24. His observations implied that "elastocized pellets produced from the extrudate can be reused in other polystyrene products," and he believed that the Sentinel EPS Recyclers "will be reliable and capable of performing the task of recycling polystyrene on a continuous basis." *Id.*

Also attached to the Memorandum was a tax opinion prepared by Boylan & Evans, a New York law firm. *See* Pls.' Ex. 1 at E–1–19. The tax opinion was addressed to the general partner and included in its first paragraph the following disclaimer:

> We have consented to your inclusion of the proposed form of this letter in the Memorandum, but this letter is intended for your own individual guidance and for the purpose of assisting prospective purchasers and their tax advisors in making their own analysis, and no prospective purchaser is entitled to rely upon this letter.

*Id.* at E–1.[14] This opinion stated "on balance, it is substantially more likely than not that the federal income tax results contemplated by the Partnership will be largely achieved." *Id.* at E–l, E–19. The opinion discussed in detail, *inter alia*, the tax treatment of the partnership, whether the Sentinel EPS Recyclers would qualify for the investment and energy tax credits, and the value of the machines for tax purposes. *See id.* at E–2–14. The opinion noted the possibility of recapture of the tax credits were the partnership to terminate before the machines were used for five years. *Id.* at E–10–11.

The tax opinion also stated that "it does not appear that there is any overstatement of the value of the property being purchased and leased," and that "in light of the F & G Evaluator's report and Pl's representation as to the price it is charging, even if it were

14. The reports of Drs. Ulanoff and Burstein each noted that the respective authors understood that their opinions "may be used as one of the bases in the decision to be made by a potential partner for the purchase of a Limited Partner's share in" the Masters partnership. Pls.' Ex. 1 at F–2, F–24.

determined that there was an overvaluation there would seem to be a reasonable basis for the original valuation." Pls.' Ex. 1 at E–13. And while noting that "[t]he absence of a profit motive may also cause the disallowance of the regular investment and energy tax credits," it was the law firm's "opinion that the facts in this case are such that the presence of a profit motive is indicated." *Id.* at E–17.

## B. The Plastics Recycling Proceedings

Roughly a score of limited partnerships had been formed in the early 1980s to lease PI's Sentinel EPE Recyclers or Sentinel EPS Recyclers, which processed expanded polyethylene or expanded polystyrene, respectively.[15] More than half of these were organized under the unified partnership audit and litigation procedures enacted as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), codified at 26 U.S.C. §§ 6221–32. These partnerships resulted in hundreds of docketed cases at the United States Tax Court, which referred to the arrangements collectively as the "Plastics Recycling programs." *See, e.g., Provizer v. Comm'r,* 63 T.C.M. (CCH) 2531, 2532 (1992).[16]

Samuel L. Winer, the tax matters partner ("TMP") of Masters, was the TMP of at least six other TEFRA partnerships involving the plastics recycling machines, and was general partner of at least five non-TEFRA partnerships involving these machines.[17] In 1984, the IRS apparently concluded that investments · in these partnerships constituted an abusive tax shelter, and the government filed a lawsuit in a federal district court in Florida seeking to enjoin Mr. Winer from participating in these tax shelters. *See Davenport*

*Recycling Assocs. v. Comm'r,* 76 T.C.M. (CCH) 562, 565 (1998). To settle that proceeding, the government demanded that Mr. Winer resign as TMP of all seven TEFRA partnerships. *Id.* at 566. After Mr. Winer informed the limited partners in each TEFRA partnership of his resignation as TMP in April 1986, his counsel concluded that because these partnerships involved no general partners other than Winer, there were no other partners eligible to serve as TMP. *See id.* at 568–70. The government and Mr. Winer then jointly moved in the district court to modify the injunction to allow Mr. Winer to resume the role of TMP, and an order to that effect was issued in September 1986. *Id.* at 570–71. During this time the IRS was engaged in audits of the various partnerships, and Mr. Winer—now restored as TMP—agreed to extend the statute of limitations for the IRS to file notices of a final partnership administrative adjustment ("FPAA") resulting from the audits. *See id.* at 571–72.

The examinations of the TEFRA partnerships ultimately resulted in the IRS decision to disallow the deductions and credits attributable to the leasing of the Sentinel recyclers. After internal protests were unavailing and a settlement offer was rejected, the partnership cases were closed by the IRS and FPAAs were prepared. *See id.* at 572. The FPAA notices regarding Masters' tax years 1982–85 were issued to Mr. Winer on June 5, 1989. *Klein v. United States,* 86 F.Supp.2d 690, 694 (E.D.Mich.1999); *West v. Comm'r,* 80 T.C.M. (CCH) 916, 918 (2000). In the FPAAs, the IRS apparently concluded that Masters had not suffered " 'a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income.' " *West,*

---

**15.** Polyethylene in its foam form is used in packaging and cushioning, as well as in insulation. Pls.' Ex. 1 at F–3. Stream chest molded expanded polystyrene is the material used in pre-formed foam packing cushions, commonly employed inside the shipping boxes of manufacturing components. *Id.* at F–5–6.

**16.** It appears that the subject of the partnerships promoted in 1981 was the Sentinel EPE Recycler, and of those promoted in 1982 was the Sentinel EPS Recycler. *See Provizer,* 63 T.C.M. at 2532.

**17.** The non-TEFRA partnerships were the Clearwater Group, Poly Reclamation Associates, Sunbelt Group, Southeast Recovery Associates, and Esplanade Associates. *See Provizer,* 63 T.C.M. at 2532. The TEFRA partnerships were Davenport, Stevens, Hamilton, Masters, Dickinson, Pompano, and Whitman Recycling Associates. *See Davenport Recycling Assocs. v. Comm'r,* 76 T.C.M. 562, 564 (1998).

80 T.C.M. at 918 (quoting FPAA); *see also Clark v. United States,* 171 F.Supp.2d 1341, 1342 (N.D.Ga.2001).[18] As a result, all losses claimed by Masters were disallowed, and the value of Masters' property for purposes of the investment and business energy tax credits was reduced to zero. *Clark,* 171 F.Supp.2d at 1342.

On July 21, 1989, Mr. Winer petitioned the Tax Court to redetermine the adjustments made in the Masters FPAA. *See Klein,* 86 F.Supp.2d at 694; *Clark v. United States,* 68 F.Supp.2d 1333, 1338 (N.D.Ga.1999). Before that case or any of the others filed by Mr. Winer as TMP went to trial, the Tax Court completed a trial in the test case of *Provizer v. Commissioner. See Davenport,* 76 T.C.M. at 574. *Provizer* concerned the Clearwater Group, one of the non-TEFRA limited partnerships in which Mr. Winer was a general partner. *See id.* at 564; *Provizer,* 63 T.C.M. at 2533. Clearwater was ostensibly organized to lease Sentinel EPE Recyclers. *See Provizer,* 63 T.C.M. at 2532. The Clearwater transactions involving the recycling machines were structured somewhat differently from those in the Masters partnership. Instead of using a joint venture to exploit the recycled product, Clearwater licensed the machines to a corporation owned by the president of PI, which in turn sublicensed them to PI, which was to sublicense them to the end users at whose plants the machines would be placed. *Id.* at 2539–41.

In *Provizer,* the Tax Court found that the Sentinel EPE Recycler was worth no more than $50,000 in 1981; that the Clearwater transaction lacked economic substance; and that the taxpayers in that case had as their objective "to gain a significant tax advantage and not to earn an economic profit." *Id.* at 2546. The court reached its determination of the fair market value of the machines by finding the testimony of the government's experts to be more persuasive than the testimony of the taxpayers' experts. *Id.* at 2548–50. The taxpayers' key expert witness was not disinterested, and based his conclusions on an assumption of the machine's uniqueness that the court rejected, and on assump-

tions of the machine's productivity that were contradicted by the experience of an end user. *Id.* at 2548–50.

The court's conclusion that the Clearwater arrangement lacked economic substance rested in part on its conclusion as to the value of the machines, as it determined that the owner/lessor of the machines had no real equity interest in them due to their low actual value. *See id.* at 2548–51. The court also based the lack of economic substance on its determination that the partnership had no genuine opportunity for economic success. *Provizer,* 63 T.C.M. at 2550–51. Concerning this point, the court noted that the entities involved in the Clearwater transactions "purportedly entered into 'offset agreements' so that the monthly payments" that were identical in amount "were bookkeeping entries only." *Id.* at 2551. Thus, the monthly licensing payments would not generate partnership income, and the court additionally found that the limited partners did not actively monitor PI's inadequate efforts to place the machines with suitable end users. *Id.*

The Tax Court in *Provizer* also considered whether the Clearwater partnership possessed "a business purpose other than tax benefits." *Id.* The court concluded it did not, finding an absence of a profit objective based on, *inter alia,* the private offering memorandum's focus on tax benefits, and the advance lease payment being twice the fair market value of the machines leased. *Id.* at 2551–52. The court also rested its conclusion on facts which developed after the taxpayers invested in the partnership, including: PI's failure to place all six machines with end users; the partnership's failure to insure the machines; the failure to meet the financial projections of revenue resulting from recycling; and the minimal efforts of Mr. Winer, as general partner, to investigate and monitor the use of the machines. *Id.* at 2551–53. The court concluded that the Clearwater arrangement was a sham designed solely to generate tax savings, and disallowed the investment and business energy tax credits based on the machines leased by the partnership. *Id.* at 2553.

---

**18.** The Court must rely on these other opinions for the language of the FPAAs, as no party to the trial proceedings *sub judice* introduced the FPAAs into evidence.

In *Provizer*, the court also found the taxpayers negligent, warranting the imposition of the section 6653(a) penalty. *See Provizer*, 63 T.C.M. at 2554. The court determined that the taxpayer responsible for the investment "made no attempt to verify the value of the recyclers by seeking the opinion of a reliable independent third party." *Id.* The projected tax benefits, "approximately $2.51 for every dollar invested," "were mentioned at three points in the offering memorandum," yet the investor failed to "ask[ ] a qualified tax adviser if this windfall were not too good to be true." *Id.* His only investment adviser was paid to find people to invest in the partnership, and reliance on this adviser was found to not relieve the taxpayers of negligence in claiming the tax benefits. *Id.*

The Sixth Circuit upheld the Tax Court without a published opinion on July 7, 1993. *Provizer v. Comm'r*, 996 F.2d 1216 (6th Cir. 1993). The trial of the test cases involving Sentinel EPS partnerships was scheduled to begin in the Tax Court less than a month later, but the TMP (SAB Management, Ltd.) instead conceded the partnership adjustments on the date set for trial. *Davenport*, 76 T.C.M. at 574 & n. 8. Over the next few months, Mr. Winer, too, decided to concede the partnership level adjustments in the cases concerning the TEFRA partnerships for which he was TMP. *See id.* at 574. On November 9, 1993, the Tax Court filed the government's "Motion for Entry of Decision" in the Masters proceeding, which stated that Mr. Winer agreed to settle the matter on terms "reflected in the decision document" that was also submitted by the government. Mot. for Entry of Dec, *Masters Recycling Assocs. v. Comm'r*, No. 18417–89 (T.C. Nov. 9, 1993). The referenced decision document was signed and entered by the Tax Court on February 23, 1994. Def.'s Ex. 5. The Decision stated that it was "ORDERED and DECIDED: That the following statement shows the adjustments to the partnership items of Masters Recycling Associates for the taxable years 1982, 1983, 1984 and 1985." *Id.* at 2.

The adjustment for the year relevant to these proceedings, 1982, read as follows:

| Partnership Item | As Reported | As Determined |
|---|---|---|
| Advanced Minimum Profit Payment | 25,000 | –0– |
| Guaranteed Payments to Partner Expense | 25,000 | –0– |
| Rent Expense | 650,000 | –0– |
| Professional Fees | 61,000 | –0– |
| Delivery, Postage, Office and Miscellaneous Expenses | 1,958 | –0– |
| Amortization Expense | 333 | –0– |
| Ordinary Loss | (713,291) | –0– |
| Investment in property qualified for investment credit | 7,000,000 | –0– |
| Investment in property qualified for energy credit | 7,000,000 | –0– |

Def's. Ex. 5. The settlement terms, then, appear to be restricted to the adjustment of each line to zero. No finding of the Tax Court describes the reason for the adjustments, and factual issues potentially relevant to. these proceedings—for instance, the actual value of the Sentinel EPS Recycler—were not litigated and decided as part of the decision.

## C. The Witnesses[19]

Five witnesses testified at trial on behalf of the plaintiffs. Two of the witnesses were the plaintiffs J. Thomas Allison III and James E. Dorsey.[20] Also testifying were Marc Heilweil, the investment adviser who advised the three investors; Robert Wilensky, the accountant who assisted Mr. Heilweil and also advised the taxpayers; and Cleburne Gregory, a tax lawyer who advised Mr. Heilweil and Mr. Dorsey. The government called no witnesses.

### 1. J. Thomas Allison III

J. Thomas Allison III received a Bachelor's degree in mechanical engineering from the Georgia Institute of Technology and an

---

**19.** This portion of the opinion contains findings of fact pursuant to Rule 52 of the Rules of the United States Court of Federal Claims.

**20.** By agreement of the parties the third investor, Sidney Olansky, was excused from testifying at trial because of his advanced age. The parties submitted a joint stipulation of facts with regard to Dr. Olansky.

M.B.A. from Harvard Business School. Tr. at 74–75. After graduation from Harvard, Mr. Allison spent four years working for the Coca–Cola Co., where he dealt with issues related to recycling and the environmental movement's potential impact on the company. *Id.* at 76–77. In his consulting business, Mr. Allison did strategic planning work for both McDonald's Corp. and Six Flags Theme Parks Inc. with regard to recycling and environmental impact. *Id.* at 78–79.

In 1982, Mr. Allison became aware of Masters through either James Dorsey or Clarence Ridley,[21] who in turn introduced Mr. Allison to Marc Heilweil and Robert Wilensky. *Id.* at 79–80. Mister Allison understood both Messrs. Heilweil and Wilensky to have good reputations among people he knew and respected. *Id.* at 84. Mister Heilweil gave Mr. Allison a copy of the Memorandum, which Allison reviewed. *Id.* at 80.

Mister Allison purchased a Masters partnership half-unit for $25,000. *See* Tr. at 95–96; Pls.' Ex. 3 at 12. On their 1982 tax return, the Allisons claimed investment tax deductions, an investment tax credit, and a business energy credit due to the partnership interest in Masters. Tr. at 115. As a result of the deductions and credits, the Allisons claimed a reduction in tax of $48,311 with respect to the Masters investment. *Id.* Masters never produced any income for Mr. Allison. *Id.* at 113.

On February 6, 1995, the Commissioner of Internal Revenue assessed additional taxes against the Allisons, as a result of the disallowance of the deductions and credits flowing from the Masters investment, in the amount of $48,311 for the 1982 taxable year. Def.'s Ex. 1 at 2. The disallowance was also the basis of an interest assessment of $142,276.21 made that same day.[22] Interest charges of $1,966.37 and $2,139.04 were added in April and May of 1995. *Id.* After the Allisons paid their outstanding balance in May 1995, they were assessed a failure to pay tax penalty of $724.66. *Id.* at 3. On June 26, 1995, an accuracy penalty of $11,550.00 was imposed under 26 U.S.C. § 6662 by a "quick assessment," a

negligence penalty of $73,554.10 was imposed, and $23,132.21 in additional interest was charged. *Id.* at 3–4. In October 1995 an interest charge of $2,738.08 was added. *Id.* at 4. All told, because of their $25,000 investment in Masters, and the $48,311 in associated tax savings claimed, the Allisons were charged interest and penalties in excess of $256,000. The Allisons paid the above-described assessments for tax year 1982. *Id.* at 3–4. Following the IRS's denial of timely-filed refund claims, the Allisons filed a complaint in this court.

### 2. James E. Dorsey

James E. Dorsey received a Bachelor's degree in civil engineering from the Georgia Institute of Technology in 1962 and a law degree from the University of Virginia School of Law in 1968. Tr. at 22–23. After graduating from law school, Mr. Dorsey joined the Atlanta law firm of Arnall Golden & Gregory, where he remains, and specialized in mergers, acquisitions, securities, joint ventures, and financial transactions. *Id.* at 23–24. During the period from 1979 to 1983, Mr. Dorsey made investments in stripper and new oil wells, oil companies, oil leases, and a waste recycling company. *Id.* at 24–25. Mister Dorsey primarily became aware of Masters through Marc Heilweil, a former associate at his law firm whom he had once supervised. *Id.* at 25.

In 1982, Mr. Dorsey purchased a half-unit in Masters for $25,000. *Id.* at 66. On their 1982 tax return, the Dorseys claimed investment tax deductions, an investment tax credit, and a business energy credit due to the partnership interest in Masters. Tr. at 67. As a result of the deductions and credits, the Dorseys claimed a reduction in tax of $42,565 on their 1982 tax return with respect to the Masters investment. *Id.* The Dorseys also filed an amended return for 1980, on which they claimed additional deductions based on carrybacks from the taxable year 1982, also due to the Masters deductions and credits. *Id.* at 68–69. The carrybacks resulted in a

---

21. Clarence H. Ridley was also an investor in Masters and was originally a plaintiff in a companion case to the cases at bar.

22. The following week, $1,665.91 of this interest was abated. Def.'s Ex. 1 at 2.

reduction of tax for 1980 in the amount of $6,037. *Id.* Thus, the Dorseys' claimed reductions in tax amounted to $48,602 for the investment in Masters. Masters never produced any income for Mr. Dorsey. *Id.* at 66.

On February 6, 1995, the Commissioner assessed additional taxes against the Dorseys, as a result of the disallowance of the claimed deductions and credits passed through from the Masters partnership, in the amount of $42,565.00 for their 1982 taxable year. Def.'s Ex. 2 at 9. Interest in the amount of $123,270.63 was also assessed that day. *Id.* On June 30, 1995, an accuracy penalty of $9,739.00 was imposed under 26 U.S.C. § 6662 by a "quick assessment," a negligence penalty of $63,763.31 was imposed, and $26,811.83 in additional interest was charged due to the disallowed deductions and credits. *Id.* at 10. In October 1995 a failure to pay tax penalty of $1,506.88 was imposed, and in December 1995 additional interest of $4,730.73 was charged. *Id.* at 11. An interest charge of $4,824.33 was assessed the following October, as were smaller amounts in February 1997 and October 1999. *Id.* at 12–13.

On March 6, 1995, also as a result of the disallowance of the Masters deductions and credits, the Commissioner assessed additional taxes against the Dorseys in the amount of $6,037.00, and interest in the amount of $16,774.27, for their 1980 taxable year. Def.'s Ex. 2 at 2. On June 30, 1995, an accuracy penalty of $1,811.00 was imposed under 26 U.S.C. § 6662 by a "quick assessment," a negligence penalty of $8,665.54 was imposed, and $3,617.68 in additional interest was charged for the 1980 tax year, all due to the disallowed Masters tax benefits. *Id.* at 3–4.

In total, because of the $25,000 investment in Masters and the $48,602 in claimed tax benefits based on this investment, the Dorseys were charged interest and penalties in excess of $265,000. Through a series of payments and credits from overpayments for other years, the Dorseys paid the above-described assessments for 1982 and 1980. *Id.* at 3–4, 9–14. Following the IRS's denial of timely-filed refund claims, the Dorseys filed a complaint in this court.

### 3. Sidney Olansky

Sidney Olansky graduated from medical school in 1956. Jt. Stip. ¶ 1. He has conducted a dermatology practice in Atlanta, Georgia. *Id.* In 1982, Dr. Olansky became aware of Masters through Robert Wilensky and Marc Heilweil. *Id.* ¶¶ 2–3.

Sidney Olansky purchased a one-quarter unit in Masters for $12,500. *Id.* ¶ 9. On their 1982 tax return, the Olanskys claimed investment tax deductions, an investment tax credit, and a business energy credit due to the partnership interest in Masters. *Id.* ¶ 10. As a result of the deductions and credits, the Olanskys claimed a reduction in tax of $24,127.00 with respect to the Masters investment. *Id.* Masters never produced any income for Dr. Olansky. Jt. Stip. ¶ 12. On February 6, 1995, as a result of the disallowance of the deductions and credits claimed from the investment in Masters, the Commissioner of Internal Revenue assessed taxes against the Olanskys in the amount of $24,127.00, and additional interest totaling $54,382.18, for the 1982 taxable year. Def.'s Ex. 3 at 3. On June 26, 1995, an accuracy penalty of $5,796.00 was imposed under 26 U.S.C. § 6662 by a "quick assessment," a negligence penalty of $26,386.82 was imposed, and $11,797.58 in additional interest was charged due to the Masters investment. *Id.* at 4. As a result of their $12,500 investment in Masters, and the $24,127 in associated tax benefits claimed by the Olanskys, they were charged interest and penalties totaling more than $98,000. Through a series of payments, the Olanskys paid the above-described assessments for 1982. *Id.* at 3–5. Following the IRS's denial of their timely-filed refund claims, the Olanskys filed a complaint in this Court.

### 4. The Advisers

The plaintiffs relied on the advice of Marc Heilweil and Robert Wilensky. *See, e.g.,* Jt. Stip. ¶ 5; Tr. at 37, 70–71, 90–91, 95. Marc Heilweil is a graduate of Yale University and Yale Law School. Tr. at 119. Prior to starting his own investment counseling business, Mr. Heilweil worked in securities law with two Atlanta law firms. *Id.* at 120. In one of

these firms, Arnall Golden & Gregory, he became acquainted and worked closely with Mr. Dorsey *Id.* He started his investment counseling firm Professional Asset Management, Inc., in 1977. *Id.* at 120–21. His current firm, Spectrum Advisory Services, Inc., was organized in 1991 as a successor to Professional Asset Management, Inc. and another business. *Id.* By the time of trial, his firm had grown to manage $305 million in clients' investments, including $17.6 million for the Marathon Value Portfolio mutual fund. *Id.* at 122. Mister Heilweil has a good reputation as a money manager, Tr. at 84, 218–19, and was viewed by his former colleague Mr. Dorsey as "one of the smartest people" he knew. *Id.* at 26.

Masters was brought to Mr. Heilweil's attention by Barry Swartz, his personal accountant. *Id.* at 127. Mister Heilweil, through his firm Professional Asset Management, Inc., became a purchaser's representative for investments in Masters. *See* Pls.' Ex. 2 at 13; Pls.' Ex. 3 at 20; Tr. at 144, 151.[23] As a consequence, he received a fee from Masters for the investments made by Messrs. Allison, Dorsey and Olansky, whom he advised in the transactions. Tr. at 143–44. The investors were informed of this fee and were not concerned by it. *Id.* at 51, 95, 144.[24] Mister Olansky, who was one of Mr. Heilweil's regular clients, was credited for the fee generated by his investment. Tr. at 144, 151. Out of the fees received from Masters, Mr. Heilweil compensated Mr. Wilensky for his assistance. *Id.* at 144–45.

Robert B. Wilensky is a graduate of Case Western Reserve University and is a certified public accountant. *Id.* at 164. After graduating from Case Western, Mr. Wilensky worked for Arthur Andersen in Boston, then Price Waterhouse in Atlanta, before becoming director of operations for a national chain of gift shops. *Id.* at 164–65. In 1977, Wilensky opened his own accounting firm in Atlanta. *Id.* at 165. In his work, Mr. Wilensky prepares tax returns and provides investment advice. *Id.* at 165–66. He at times worked with Mr. Heilweil in advising

common clients, or providing accounting and tax advice for Mr. Heilweil's clients. Tr. at 166. Mister Wilensky worked with Mr. Heilweil in investigating the Masters partnership. *Id.* at 131–32, 167–69. Mister Dorsey knew that Heilweil placed confidence in Mr. Wilensky, and Mr. Allison knew that Mr. Wilensky had a good reputation for his investment advice. *Id.* at 53, 84. Mister Wilensky was Mr. Olansky's accountant, and personally advised Messrs. Olansky and Allison concerning the tax treatment of the Masters investment. *Id.* at 182, 201.

Cleburne E. Gregory III received a Bachelor's degree from Washington & Lee University, a J.D. from the University of Georgia, and an L.L.M. in taxation from Emory University. *Id.* at 212. After law school he clerked for the United States Court of Appeals for the Fifth Circuit, and then joined Arnall Golden & Gregory, where he remains as the head of the firm's tax department. *Id.* at 213–14. Mister Dorsey, his law partner, gave Mr. Gregory a copy of the Masters Memorandum, including the tax opinion letter, to review. Tr. at 33–35, 215. Mister Gregory took up to four hours reviewing the Memorandum, and orally provided an informal opinion to Mr. Dorsey and Mr. Heilweil concerning the Memorandum's description of the tax consequences of investments in the Masters partnership. *Id.* at 35, 129–30, 215–20, 224–25.

## II. DISCUSSION

This Court has jurisdiction over tax refund claims pursuant to the Tucker Act, 28 U.S.C. § 1491. *See Hinck v. United States,* 64 Fed. Cl. 71, 74–76 (2005); *see also Ontario Power Generation v. United States,* 369 F.3d 1298, 1301 (Fed.Cir.2004); *Shore v. United States,* 9 F.3d 1524, 1525 (Fed.Cir.1993). In the cases at bar, plaintiffs seek tax refunds of the negligence penalties imposed under section 6653(a) of the tax code as it applied to the years in question. These penalties consisted of two parts: a penalty equal to five percent of the underpayment of certain taxes "due to

---

**23.** The referenced documents are pages 10 and G–10, respectively, of the subscription agreements of Messrs. Dorsey and Allison.

**24.** The fee was also disclosed in the Memorandum. *See* Pls.' Ex. 1 at 6, 15.

negligence or intentional disregard of rules and regulations," and an additional penalty amount of fifty percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard. 26 U.S.C. § 6653(a)(1)(2) (1983).[25]

As the government points out, *see* Def.'s Br. at 17–18 & n. 5, the Tax Court has decided many cases in which taxpayers who invested in the same or similar plastics recycling partnerships challenged the imposition of negligence penalties. *See, e.g., Weitzman v. Comm'r*, 82 T.C.M. (CCH) 419, 423–24 (2001); *Thornsjo v. Comm'r*, 81 T.C.M. (CCH) 1700, 1707–09 (2001); *West v. Comm'r*, 80 T.C.M. (CCH) 916, 921–23 (2000); *Barber v. Comm'r*, 80 T.C.M. (CCH) 810, 819–24 (2000); *Barlow v. Comm'r*, 80 T.C.M. (CCH) 632, 639–42 (2000), *aff'd.* 301 F.3d 714 (6th Cir.2002); *Ulanoff v. Comm'r*, 77 T.C.M. (CCH) 2034, 2041–44 (1999); *Greene v. Comm'r*, 73 T.C.M. (CCH) 3205, 3209–14 (1997); *Kaliban v. Comm'r*, 73 T.C.M. (CCH) 3024, 3033–40 (1997); *Sann v. Comm'r*, 73 T.C.M. (CCH) 2950, 2960 n. 13 (1997) (and cases cited therein), *aff'd sub nom. Addington v. Comm'r*, 205 F.3d 54 (2d Cir.2000). Although the Tax Court determined that the taxpayers were negligent in all but two of the plastics recycling cases brought to the Court's attention,[26] every case must be considered on its own merits. Moreover, the Court notes that only three of the plastics recycling cases in which the negligence penalties were upheld concerned investments in partnerships employing the Sentinel EPS Recycler. *See West*, 80 T.C.M. at 917; *Ulanoff*, 77 T.C.M. at 2036; *Gottsegen v. Comm'r*, 74 T.C.M. (CCH) 50, 51 (1997).[27]

The parties disagree on the substantive law to be applied in these cases. They agree

that "negligence," which was undefined in the tax code provision in force at the time, means essentially "the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Def.'s Br. at 16 (citing, *inter alia, Addington*, 205 F.3d at 58); *see also* Pls.' Br. at 27 (citing *Holmes v. Comm'r*, 184 F.3d 536, 549 n. 22 (6th Cir.1999)). But they differ concerning the circumstances under which it may be deemed reasonable to rely on the advice of professionals.

## A. Applicable Law

The Court notes two aspects of these cases that are somewhat unusual. First, the determination of taxpayer negligence under old section 6653 concerns legal issues that have rarely been presented to the Federal Circuit.[28] The one opinion on the topic involves an investment in Stevens Recycling Associates, one of the TEFRA partnerships for which Mr. Winer was TMP. *See Conway v. United States*, 50 Fed.Cl. 273, 276 (2001), *aff'd*, 326 F.3d 1268 (Fed.Cir.2003). In *Conway*, discussed in more detail below, the Federal Circuit upheld summary judgment for the government, where the taxpayer had not "presented any evidence that he made any inquiry at all into the investment," and where an attorney merely provided him an "investment tip," not professional investment advice. *Conway*, 326 F.3d at 1279. Due to the taxpayer's failure to take any care, the case hardly provided occasion for the Federal Circuit to enunciate a standard or framework for deciding negligence penalty cases generally. The Court, however, is not aware of any authority that contradicts the following sensible description of the task at hand: "The inquiry into a taxpayer's negligence is

---

25. Section 6653 was repealed by the Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, 103 Stat. 2400. Currently, negligence is codified as a component of the accuracy-related penalty. *See* 26 U.S.C. § 6662(b).

26. In both *Dyckman v. Commissioner*, 77 T.C.M. (CCH) 1543, 1544–45 (1999), and *Zidanich v. Comm'r*, 70 T.C.M. (CCH) 367, 373–75 (1995), the Tax Court held that the negligence penalty should not have been imposed upon the taxpayers.

27. The Court also notes that in *Gottsegen* and in *Ulanoff*, only the government offered expert testimony on the value of the Sentinel EPS Recycler. *See Gottsegen*, 74 T.C.M. at 54, 58–59; *Ulanoff*, 77 T.C.M. at 2037. In *West*, the parties stipulated as to the value of the machines. *See West*, 80 T.C.M. at 918.

28. There also appears to be no Federal Circuit precedent concerning the negligence penalty in its current form, as a portion of the section 6662 penalty.

highly individualized, and turns on all of the surrounding circumstances including the taxpayer's education, intellect, and sophistication." *Merino v. Comm'r*, 196 F.3d 147, 154 (3d Cir.1999). Whether or not a taxpayer was negligent in claiming deductions or credits would seem by its nature to involve "a very fact-specific determination." *Klein v. United States*, 94 F.Supp.2d 838, 849 (E.D.Mich.2000).

Second, these cases are procedurally anachronistic. In *Conway*, the Federal Circuit applied to the negligence penalty issue the general, judicially-created principle that a "ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong." *Conway*, 326 F.3d at 1278 (quoting *Transamerica Corp. v. United States*, 902 F.2d 1540, 1543 (Fed.Cir.1990) (citing *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933))). This was not in itself unusual, as it accorded with the practices of the other federal courts of appeals at the time.[29] But considering the fact-specific nature of a negligence determination, this presumption of correctness appears misplaced, at best. The presumption here rests on IRS "Certificates of Assessments and Payments," which are merely computer printouts showing that a little more than sixteen months after the Tax Court decision was entered in the Masters matter, negligence penalties were imposed on the taxpayers. *See* Def.'s Ex. 1 at 3; Def.'s Ex. 2 at 4, 10; Def.'s Ex. 3 at 4. In contrast to the entries for the additional tax added due to the Masters adjustments, which state they were "assessed by examination," there is no explanation as to how these penalties came to

be imposed.[30] There is no record showing whether the Commissioner at all investigated the actions of each individual taxpayer or any explanation about the standard of care expected and the reason each taxpayer was found to fall short of this standard. Nor do the cursory denials of the tax refund requests provide any explanation for the negligence determinations. *See, e.g., Dorsey v. United States*, Ex. B to Compl. (letters from IRS). In short, the presumption is enjoyed in the absence of any record indicating that the care taken by the individual taxpayers was even considered by the Commissioner.[31]

As a consequence, the taxpayers are in the position of needing to prove that they were not negligent without the benefit of knowing why the Commissioner thought that they were. For cases arising out of examinations or taxable periods occurring after July 22, 1998 this is less of a complication, due to the burden-shifting provision of the IRS Restructuring and Reform Act of 1998. *See* Pub.L. No. 105–206, § 3001, 112 Stat. 685, 726–27 (part of the Taxpayer Bill of Rights 3, codified at 26 U.S.C. § 7491). Under this provision, in circumstances in which the taxpayer provides basic cooperation, the government has both the initial burden of production and the ultimate burden of proof on factual issues relating to a taxpayer's liability for a penalty relating to income or estate and gift taxes. 26 U.S.C. § 7491(a),(c).[32] Thus, at least once the cases arrive at the courthouse, the government in the future may typically be the party framing and proving the question of negligence. But the cases at bar are of the vintage governed by *Conway*, not section 7491, and—despite the indeterminate nature of the negligence at issue—the burden of

---

**29.** *See, e.g., Zfass v. Comm'r*, 118 F.3d 184, 188 (4th Cir.1997); *Westbrook v. Comm'r*, 68 F.3d 868, 880 (5th Cir.1995); *Goldman v. Comm'r*, 39 F.3d 402, 407 (2d Cir.1994); *Wolf v. Comm'r*, 4 F.3d 709, 715 (9th Cir.1993); *Pasternak v. Comm'r*, 990 F.2d 893, 902 (6th Cir.1993); *McMurray v. Comm'r*, 985 F.2d 36, 42 (1st Cir. 1993); *Accardo v. Comm'r*, 942 F.2d 444, 452 (7th Cir.1991); *Page v. Comm'r*, 823 F.2d 1263, 1272 (8th Cir.1987); *Cates v. Comm'r*, 716 F.2d 1387, 1390 (11th Cir.1983).

**30.** *Compare* Def.'s Ex. 1 at 2, Def.'s Ex. 2 at 2, 9 & Def.'s Ex. 3 at 3 *with* Def.'s Ex. 1 at 3, Def.'s Ex. 2 at 4, 10, & Def.'s Ex. 3 at 4.

**31.** The Supreme Court at one time found unreasoned presumptions of negligence to be constitutionally infirm. *See, e.g., W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642–44, 49 S.Ct. 445, 73 L.Ed. 884 (1929).

**32.** *But see Higbee v. Comm'r*, 116 T.C. 438, 446–47, 2001 WL 617230 (2001) (interpreting the burden of proof provision of 26 U.S.C. § 7491(a) to not apply to penalties). Based on the provision's plain language, the Court disagrees with the *Higbee* interpretation of the burden-shifting provision.

proof falls on the taxpayers. *See Conway,* 326 F.3d at 1278; *cf. Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir. 1990) (holding that burden of proof falls on taxpayers in challenge to disallowance of deductions).

Turning to the substantive law of taxpayer negligence, major portions of the taxpayers' cases rest on their reliance on professional advice in claiming the deductions and credits flowing from the Masters investment. The ultimate question of a taxpayer's negligence in underpaying taxes would seem to be, as a subset of negligence generally, a question of fact—as all authorities to this Court's knowledge have held. *See, e.g., Westbrook v. Comm'r,* 68 F.3d 868, 880 (5th Cir.1995); *Pasternak v. Comm'r,* 990 F.2d 893, 902 (6th Cir.1993); *Allen v. Comm'r,* 925 F.2d 348, 353 (9th Cir.1991); *cf. Wilkerson v. McCarthy,* 336 U.S. 53, 62, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (explaining that negligence is a question of fact for a jury); *United States v. Ford Motor Co.,* 463 F.3d 1286, 1294 (Fed. Cir.2006) (holding that gross negligence is a question of fact). The parties, however, dispute the conditions which would make a taxpayer's conduct reasonable or unreasonable. According to the plaintiffs, good faith reliance on a tax adviser will always be reasonable, negating any charge of negligence. Pls.' Br. at 27–29. The government, on the other hand, argues that it is unreasonable to rely on advisers who are not experts concerning the subject matter of an investment, or who have any connection with the promoters of the investment. *See* Def.'s Br. at 16–23.

The case law on these points traces back to dictum in the Supreme Court's opinion in *United States v. Boyle,* 469 U.S. 241, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985). In *Boyle,* the Supreme Court considered whether an estate executor's failure to file the estate's tax return on time could be excused because the estate's lawyer forgot to calendar the due date. *See id.* at 242–44, 105 S.Ct. 687. The executor could avoid a failure to file penalty by demonstrating "reasonable cause," defined by regulation to mean the exercise of "ordinary business care and prudence." *Id.* at 243, 246, 105 S.Ct. 687. Although the

Supreme Court thought it ordinary and prudent to "[e]ngag[e] an attorney to assist in the probate proceedings," *id.* at 250, 105 S.Ct. 687, the analysis did not end there. The Supreme Court elaborated that "[w]hen an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for a taxpayer to rely on that advice." *Id.* at 251, 105 S.Ct. 687 (emphasis in original). But the failure to file the tax return on time was *not* because the attorney misinterpreted any laws, through negligence or otherwise—he just forgot about the deadline. *Id.* No *advice* was involved, and the Supreme Court explicitly stated that it was not addressing the circumstance in which a lawyer mistakenly advised his client that a deadline was later than the law provided, and the client complied with the erroneous deadline. *Boyle,* 469 U.S. at 251 n. 9, 105 S.Ct. 687.

In *Boyle,* the attorney's mistake was not in the form of "substantive advice of an accountant or an attorney," but concerned a matter the likes of which "one does not have to be a tax expert to know." *Id.* at 251, 105 S.Ct. 687. The error concerned an "unambiguous statute" that "require[d] no special training or effort" to understand, and thus the court concluded that the neglect of the executor's agent was not "reasonable cause" for the deadline to have been missed. *Id.* at 251–52, 105 S.Ct. 687. While the holding of *Boyle* is limited to just that circumstance, the decision provides a broader framework for analysis. The decision recognizes that technicalities of the tax code are beyond the ken of the average lay person, and that it is reasonable to rely on the advice of lawyers or accountants concerning such technicalities, even if the advice proves incorrect. *See id.* at 251, 105 S.Ct. 687 (explaining that "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney" and that "[t]o require the taxpayer ... to seek a 'second opinion' ... would nullify the very purpose of seeking the advice of a presumed expert in the first place"). The negligence of a tax adviser, then, is not imputed to the taxpayer when such technicalities are at issue. On the other hand, if the negligence is not in interpreting a law and advising the taxpayer, but is the ignoring of a

law, the negligence is imputed to the taxpayer if the statute is unambiguous and requires no "special ... effort to ascertain." *Id.* at 252, 105 S.Ct. 687. Of the ground falling between these two poles, the court left unaddressed the question of a lawyer's negligence in *interpreting* an unambiguous statute, *id.* at 251 n. 9, 105 S.Ct. 687, and seemed to imply that it is reasonable to rely on a lawyer's failure to follow a statute that can, with special effort, be understood by a taxpayer. *Boyle,* 469 U.S. at 252, 105 S.Ct. 687.

The *Boyle* analysis was restricted to questions involving the assistance of lawyers and accountants regarding tax laws. Its applicability is pretty clear and straightforward when the advice relied upon is in the form of, say, an opinion letter evaluating the requirements of particular tax code provisions. But another type of advice is relevant when the taxpayer negligence at issue is the failure to have appreciated that the IRS would determine a transaction to be an abusive tax shelter. In the cases at bar, the taxpayers failed to anticipate that FPAAs would issue reducing to zero the value of the Masters deductions and investment credits. These FPAAs were based on the conclusion that the Masters did not incur " 'a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income.' " *West,* 80 T.C.M. at 918. Presumably, taking *Provizer* as our template, this conclusion rested upon the Commissioner's determination that the Masters partnership lacked either economic substance, objectively viewed, or a legitimate business purpose, based on the subjective intentions of the partners. *See Provizer,* 63 T.C.M. at 2546–53; *see also Coltec Indus., Inc. v. United States,* 454 F.3d 1340, 1355–57 (Fed.Cir.2006) (discussing economic substance and subjective business profit motive tests).

But what if taxpayers received advice from investment advisers and counselors to the effect that investments, which are subsequently determined to be abusive tax shelters, could be profitable apart from any

tax benefits? Although this advice is not the exclusive province of lawyers and accountants, and is not necessarily an express opinion that deductions and credits may legitimately be· claimed on a tax return, the Circuits which have considered the matter all seem to agree that such advice *could,* under the right circumstances, be relied upon pursuant to *Boyle. See, e.g., Anderson v. Comm'r,* 62 F.3d 1266, 1268, 1271 (10th Cir.1995) (concerning investment advice from a securities dealer); *Goldman v. Comm'r,* 39 F.3d 402, 404 (2d Cir.1994) (concerning investment advice from an accountant serving as sales representative for a promoter); *Heasley v. Comm'r,* 902 F.2d 380, 381, 383–84 (5th Cir.1990) (involving advice from a financial adviser and the accountant he recommended). Where the Circuits—and the parties to these cases—differ is as to the circumstances in which reliance on professional investment advice is reasonable.

At one end of the continuum is the approach taken by the Second Circuit. In *Goldman,* taxpayers had claimed deductions based on a partnership's "expensive sublicense agreement for the right to use" an oil and gas drilling machine, "even though no prototype of the drill had been developed." 39 F.3d at 404. An accountant, after merely reviewing the offering memorandum, had advised the taxpayers to invest in the partnership, and the latter sought to avoid the negligence penalty on the basis of this advice. *Id.* at 408. The Second Circuit found reliance on such advice to be unreasonable, in part because the adviser "expressed no knowledge of drilling technology or the oil and gas business," relied solely on the offering memorandum, and "made no independent inquiries regarding the partnership." *Id.* On the basis of this extreme example, the Second Circuit cast the *Boyle* rule as concerning the advice of *experts:* "Reliance on expert advice is not reasonable where the 'expert' relied on knows nothing about the business in which the taxpayer invested." *Id.* (citations omitted).[33]

---

**33.** It should be noted that the adviser in *Goldman* was described as "a member of the accounting firm that regularly prepared appellants' per-

sonal and business tax returns," and nothing indicates that this individual was in the business of providing investment advice. *Goldman,* 39

While the "knows nothing" standard might appear to set the bar rather low, the Second Circuit subsequently explained that to establish reasonable reliance on an investment adviser, a taxpayer had to show that the adviser "was qualified to render an expert opinion to the taxpayers as to the business merits" of the subject transaction. *Chimblo v. Comm'r*, 177 F.3d 119, 126 (2d Cir.1999). That court interprets *Boyle* to "stand[ ] for the proposition that reliance on an adviser is reasonable where the adviser has expertise in the relevant area." *Addington v. Comm'r*, 205 F.3d 54, 58 (2d Cir.2000). The Second Circuit focuses, then, on the *Boyle* description of tax law advice from an attorney or accountant being " 'the advice of a presumed expert.' " *Id.* (quoting *Boyle*, 469 U.S. at 251, 105 S.Ct. 687). The Court notes, however, that the Second Circuit approach may ultimately prove to be not too far removed from the alternative positions, as *Addington* left open the possibility that an adviser lacking expertise in an industry may nonetheless be reasonably relied upon if the adviser adequately investigates the proposed investment. *See id.* at 58–59.

At the other end of the continuum is one of the courts from which the Second Circuit borrowed the "knows nothing" standard. *See Goldman*, 39 F.3d at 408 (citing *Freytag v. Comm'r*, 904 F.2d 1011, 1017 (5th Cir. 1990), *aff'd*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)). The Fifth Circuit continues to explain, in the context of "professional advice concerning tax laws," that reliance on "someone with no knowledge concerning [the] matter upon which the advice is given" is not objectively reasonable. *Chamberlain v. Comm'r*, 66 F.3d 729, 732 (5th Cir.1995). In practice that court has kept the bar low, not requiring expertise in the subject matter of the advice. In *Chamberlain*, for instance, the Tax Court found that the taxpayers' advisers, respectively, had "no expertise in dealing with" the transactions at issue, "never understood how" the transactions worked, and did not appear to

be "qualified to give advice as to the bona fides of" the transactions. *Chamberlain v. Comm'r*, 67 T.C.M. (CCH) 2992, 2994 (1994). The latter adviser had "no specialized knowledge in securities transactions, and he made no independent investigation of" the transactions. *Id.* at 2993–2. Yet, the Fifth Circuit reversed the Tax Court on the issue of negligence, finding the adviser a suitable "tax expert" upon whom the taxpayers could reasonably rely. *Chamberlain*, 66 F.3d at 733.

Similarly, in *Durrett v. Commissioner*, the Tax Court found that an attorney who gave investment advice to the taxpayers was "not an expert in financial markets or in tax advantaged investments," and that an accountant who advised them "had no experience with financial transactions of the type" involved. 67 T.C.M. (CCH) 2735, 2737 (1994). The Fifth Circuit reversed the Tax Court's negligence determination, considering these individuals "experts." *Durrett v. Commissioner*, 71 F.3d 515, 518 (5th Cir.1996).[34] The Fifth Circuit thus considers professional investment advisers to be "experts" without regard for their particular expertise concerning the industry or the transaction that is the topic of the advice. That court instead elevates in importance the *Boyle* language that it "would nullify the very purpose of seeking the advice" were taxpayers to be required "to challenge" their advisers, "to seek a 'second opinion,' or to try to monitor" their advisers. *See Durrett*, 71 F.3d at 518; *Chamberlain*, 66 F.3d at 733 (quoting *Boyle*, 469 U.S. at 251, 105 S.Ct. 687).

Rounding out the range of approaches, the Tenth Circuit follows the Fifth Circuit, but moves to a more centrist position by clarifying the knowledge requirement. The Tenth Circuit also believes that "one does not have to be an expert in an industry before he can invest in the industry himself or recommend an investment to another." *Anderson*, 62 F.3d at 1271. But that court resisted adopting a blanket immunity from negligence

F.3d at 404; *see also Goldman v. Comm'r*, 66 T.C.M. (CCH) 1060, 1061 (1993).

**34.** A third adviser upon whom the taxpayers were found to reasonably rely, discussed in more detail below, was another partner in the abusive tax shelter, responsible for the transactions at issue and for preparing the partnership returns. *See Durrett*, 67 T.C.M. at 2738.

when a taxpayer relies on an investment adviser. Instead, the reasonable investigations of an investment adviser can be imputed to the taxpayers who received the advice. Thus, a registered securities dealer's investment advice could reasonably be relied upon, even though that adviser "lack[ed] knowledge and experience in the [relevant] industry," when the adviser investigated the investment in question. *Id.* But if the taxpayers are on notice of information that would tend to raise doubts about the investment, they must reasonably verify or investigate matters themselves. *See id.* at 1272–73 (finding that structure of transaction and mismatch between useful life of cargo containers and the seller's obligation to attempt to lease them should have induced greater scrutiny from the taxpayers).

The Court finds the approach of the Second Circuit to be the least persuasive of the lot, for many of the reasons expressed by the district court in *Klein. See* 94 F.Supp.2d at 851. One cannot lose sight of the goal of the inquiry in cases such as these, which is the determination of whether a taxpayer's actions in claiming certain tax deductions or credits were what a reasonable and ordinarily prudent person would do. The Supreme Court's dictum in *Boyle* addresses but one aspect of this—reliance on legal advice. It is significant that, although the Supreme Court recognized that preparing estate tax returns is a job that a lay person could perform, it did not adopt the rule that when a taxpayer delegates this job to a negligent lawyer, the resulting negligence is the taxpayer's responsibility. *See Boyle,* 469 U.S. at 250–52, 105 S.Ct. 687. Instead, the Supreme Court carefully restricted the imputed negligence to circumstances where an attorney fails to comply with "an unambiguous statute" which "requires no special training or effort" to be understood. *Id.* at 251–52, 105 S.Ct. 687. And even though a lay person, albeit employing "special ... effort," could figure out the relevant tax laws, the Supreme Court did not accordingly condition the reasonableness of reliance on the special knowledge of *tax* law possessed by a lawyer. *See id.* at 251, 105 S.Ct. 687.

When a taxpayer's actions are scrutinized for reasonableness and the underlying matter is the failure to recognize that the IRS would find a transaction to lack economic substance or a profit motive, the advice received from investment advisers becomes relevant. If the taxpayer were advised that an investment was expected to be profitable, then that taxpayer may believe that it represents a legitimate profit-making opportunity. Under the Second Circuit approach, before taxpayers could claim any tax consequences of their investments, they would have to determine whether their investment adviser would qualify as an expert in the industry or transaction that the investments involved. While this approach might boost the employment prospects of lawyers, it would have the practical effect of preventing taxpayers from claiming the tax consequences of investments in the newest ideas and technologies, which may not yet have spawned a cottage industry of qualified experts. *See Klein,* 94 F.Supp.2d at 851.

Moreover, this approach is inconsistent with the reasoning of *Boyle.* No reason has been provided for believing that investment advisers are any less likely to be generalists in their profession than are attorneys. As discussed above, the Supreme Court in *Boyle* did not limit reasonable reliance to advice from lawyers who are *tax* experts (or experts in the business to which the tax laws are being applied), or to advice concerning matters that a lay person could not possibly figure out himself. *See Boyle,* 469 U.S. at 250–52, 105 S.Ct. 687. Just because an investment adviser has no more expertise concerning an industry than a taxpayer has is not a valid reason to hold that the taxpayer may not reasonably rely on that adviser. After all, investment advisers might be consulted not because of expertise in a particular industry, but because of a different sort of "expertise"—their specialization in analyzing business prospects in disparate fields. And although through "special ... effort" a taxpayer might be able to reach his own conclusions concerning the business prospects of an investment opportunity, it is certainly reasonable and efficient to delegate this task to an adviser, and could be extraordinarily imprudent to expend the resources to locate

and engage an expert in a particular industry or transaction. *See Klein,* 94 F.Supp.2d at 851.

For these reasons, the Fifth Circuit approach more realistically reflects the type of expertise possessed by investment advisers, by treating professional advisers as "experts" without regard for their expertise in the particular subject matter of an investment. The Court finds that the modification to this approach employed by the Tenth Circuit most faithfully applies the reasoning behind *Boyle.* Because investors—particularly sophisticated ones—are more "competent to discern error in the substantive advice" of an investment adviser than in that of a lawyer or accountant, *cf. Boyle,* 469 U.S. at 251, 105 S.Ct. 687, it is not reasonable for a taxpayer to rely upon an investment adviser when the taxpayer knows that the adviser did not reasonably investigate the business opportunity. And as an analogue to the situation when an "unambiguous statute" that "requires no special effort" to understand is ignored by an adviser, reliance on an investment adviser is not reasonable when the taxpayer possesses information casting such doubts upon the investment that due care would require personal investigation. *See Anderson,* 62 F.3d at 1272–73.

One additional factor recommending the Fifth Circuit approach is the Federal Circuit's treatment of that precedent in *Conway.* In that case, the taxpayer had learned of the opportunity to invest in a plastics recycling partnership through a single conversation with an entertainment lawyer. The Federal Circuit found "a complete lack of evidence that [the lawyer] was making any such recommendation in his capacity as counsel or as investment adviser." *Conway,* 326 F.3d at 1279. The taxpayer argued that the *Durrett* and *Chamberlain* decisions should be followed, providing the Federal Circuit with the opportunity to disapprove of the Fifth Circuit's failure to require expertise in the subject matter of the investment. *See id.* at 1279 n. 7. Instead, the court merely distinguished the cases on the ground that "[i]n each case the advice was rendered in a professional capacity," in contrast to the solitary "investment tip" received by Conway. *Id.*

The identical Circuit split concerns the other area of legal disagreement between the parties—whether it is *per se* unreasonable to rely on advisers who are known to possess some sort of conflict of interest. The Second Circuit takes the absolutist approach, holding "it is unreasonable to rely on the advice of someone who they know has a conflict of interest." *Addington,* 205 F.3d at 59 (citing *Goldman,* 39 F.3d at 408). The Fifth Circuit similarly explains that "taxpayers may not rely on someone with an inherent conflict of interest." *Chamberlain,* 66 F.3d at 732 (citing *Goldman,* 39 F.3d at 408). But in practice, that court—perhaps following a different standard to determine when a conflict is "inherent"—has found reliance on advisers with interests in the subject investment to be reasonable. For example, in *Durrett,* one of the taxpayers' advisers was another partner in the investment, who "handled the transactions" and "prepared the partnership returns," *Durrett,* 67 T.C.M. at 2738, and all three advisers, in turn, relied upon information provided by a person who was paid to promote the investment (and was also an investor). *Id.* at 2737, 2742 & n. 10. Yet the Fifth Circuit reversed the Tax Court and found the taxpayers' reliance to be reasonable. *Durrett,* 71 F.3d at 518. Similarly, in *Chamberlain* the Fifth Circuit reversed the Tax Court and determined that the taxpayers reasonably relied on an adviser. *Chamberlain,* 66 F.3d at 733. In that case, the Tax Court found that the adviser—an accountant for the partnership—based his assessment on the opinion letter provided with the offering materials. *See Chamberlain,* 67 T.C.M. at 2993–93–2.

Given the fact-specific nature of the question of a taxpayer's negligence, the Court rejects the *per se* rule urged by the government. An adviser's connections with the promoters of an investment, including a financial interest in the subject matter of the advice, is certainly one factor to be considered in determining if taxpayers could reasonably rely on that adviser's advice. But it is not necessarily the decisive factor. *See Klein,* 94 F.Supp.2d at 849–50, 852. As the Tenth Circuit explained, commissions on an investment adviser's sales are common. *See*

*Anderson,* 62 F.3d at 1271. And countervailing factors may be present, on net rendering reliance reasonable. Indeed, financial interests can cut both ways, and in some circumstances the fact that an adviser had also participated in the investment could be taken as a reason to have greater confidence in his advice. *Id.*; *see also Klein,* 94 F.Supp.2d at 850 n. 13. Advisers with good reputations, or preexisting relationships with their clients, may have a stronger personal interest in providing honest advice to clients than in earning a one-time commission. *See Anderson,* 62 F.3d at 1271 (concluding that taxpayer could reasonably rely on an investment adviser who was a friend and possessed a good reputation in the community); *Klein,* 94 F.Supp.2d at 850 (explaining that it might have been reasonable to rely on an adviser who was "highly recommended" by a taxpayer's "long-time trusted friend and accountant"); *cf. Zidanich v. Comm'r,* 70 T.C.M. (CCH) 367, 374 (1995) (holding that unsophisticated investors could rely on a conflicted adviser when they had a long-term relationship with that adviser). And it may be reasonable to rely on the advice of investment advisers who extensively investigate the business prospects of an investment opportunity, even though (or perhaps because) the adviser has a financial stake in the investment. *See Klein,* 94 F.Supp.2d at 850. In sum, even when an investment adviser has a potential conflict of interest, other considerations may be present that would make a taxpayer's expectation of loyalty reasonable under the circumstances.

The parties' other legal disagreements are more properly viewed as disputes over the application of law to the particular facts of these cases, and will be discussed in the context of the factual findings and legal conclusions, below.

## B. Findings of Fact and Conclusions of Law

These cases concern the reasonableness of taxpayers' actions in claiming tax deductions and credits based on their interests in the Masters partnership. The unaudited financial statements that partners in Masters received from the partnership's accountant informed them that, for 1982, the per unit share of Masters's losses was $39,231 and the per unit share of investment and energy tax credits based on the recycling machines leased by Masters was $77,000. *See* Pls.' Ex. 3 at 5. The taxpayers owning a half-unit interest in Masters, the Dorseys and the Allisons, used these figures to claim tax reductions in excess of $48,000.[35] The Olanskys, based on a quarter-unit interest, claimed a reduction in 1982 taxes totaling $24,127.00. Jt. Stip. ¶¶ 9–10; *see also* Def.'s Ex. 3 at 3 (Olanskys' additional taxes assessed due to the Masters adjustments). After the IRS audited the partnership returns, it determined that Masters represented an abusive tax shelter, as the partnership had not suffered " 'a loss in a trade or business or in an activity entered into for profit or with respect to property held for the production of income.' " *West,* 80 T.C.M. at 918 (quoting FPAA). The TMP challenged the FPAAs in the Tax Court but ultimately settled the case, accepting the adjustments for tax year 1982. Because of these adjustments, partners in Masters could claim no losses due to their investment in the partnership, and could claim no tax credits for the partnership's leased equipment. Def.'s Ex. 5 at 2.

The ultimate question to be answered, in each case, is whether a reasonable and ordinarily prudent person, under the same circumstances, could have claimed the deductions and credits due to Masters. The burden falls on the plaintiffs to prove that they were not negligent in treating Masters as a legitimate investment for purposes of their personal tax returns. Although the record does not contain any explanation of the IRS's reasoning concerning the Masters partnership in particular, we may assume that the characteristics it shared with the Clearwater partnership, examined in *Provizer,* were found problematic in the case of Masters. That is, the IRS viewed the

---

35. The Allisons claimed a reduction of $48,311 for 1982, Tr. at 115, and the Dorseys claimed reductions of $6,037 for 1980 (due to a carryback) and of $42,565 for 1982. Tr. at 67–69; *see also* Def.'s Ex. 1 at 2 (Allisons' additional taxes assessed due to the Masters adjustments); Def.'s Ex. 2 at 2, 9 (Dorseys' additional taxes assessed due to the Masters adjustments).

transactions involving the recycling machines as lacking economic substance, and designed to dramatically inflate the claimed value of the machines; and suspected that the purpose was to generate excessive tax benefits based on this inflated value, rather than legitimate business profits. *See Provizer*, 63 T.C.M. at 2546–53.

In determining whether the taxpayers acted reasonably, the Court will consider their efforts to investigate and understand the business prospects and tax consequences of the Masters partnership—including the efforts of their advisers. *See supra* Part II. A. We begin with their advisers.

### 1. Heilweil

Marc Heilweil, an investment adviser, was the individual ultimately responsible for bringing the Masters investment to the attention of the plaintiffs. Doctor Olansky was one of his regular clients, Mr. Dorsey was a friend and former colleague, and Mr. Allison learned of Masters through either Mr. Dorsey or Clarence Ridley.[36] Tr. at 25–26, 79–80, 151; Jt. Stip. ¶ 3. Heilweil had learned of Masters from his personal accountant, Barry Swartz, who sent him a copy of the Memorandum. Tr. at 127. He studied the Memorandum for approximately eight hours and then called Mr. Swartz to obtain additional information concerning the companies and people involved in Masters and to learn the basis for Mr. Swartz's belief in the soundness of the investment. *Id.* at 128–29.

Heilweil then undertook his own research into the prospects of the Masters partnership. At that time, Mr. Heilweil had investments in and followed developments in the chemical industry. *Id.* at 127. He subscribed to *Chemical Week* and was a Dow Chemical Co. shareholder. *Id.* at 137–38. To verify the plausibility of the joint venture's plan to recycle polystyrene waste into reusable resin pellets, he reviewed *Chemical Week* articles and Dow Chemical reports to get a sense of the problem posed by foam plastic and polystyrene waste. *Id.* at 129, 138. He learned that the amount of this waste was increasing and that disposing of it

was becoming a problem for the industry. *Id.* at 138. He also believes he called Dow Chemical to ask an investor relations officer questions concerning plastics recycling problems, programs, and machines. *See* Tr. at 152–54. Although Mr. Heilweil could not recall the details of this conversation, this was understandable since the event occurred more than twenty-two years in the past, and his testimony on this point was credible.

Mister Heilweil scrutinized the potential profitability of recycling polystyrene waste into reusable resin pellets. He had an accountant check the calculations contained in the Memorandum's financial projections. *Id.* at 136. He knew that petroleum products were the primary input in making resin pellets, and that the price of such pellets would increase if oil prices increased. Heilweil knew that the consensus view at the time was that oil prices would continue to increase, and could reach $100 per barrel by 1990. *Id.* at 136–37. He thus concluded that the business plan of Masters was likely to be profitable. *Id.*

Heilweil also asked Mr. Gregory for his view of whether the Masters transactions were structured in a manner to obtain the projected tax benefits. *Id.* at 129. He learned that Mr. Gregory believed that the tax opinion letter accompanying the Memorandum was "technically correct," but whether the benefits as calculated would be recognized depended on whether the Sentinel EPS Recyclers were properly valued. *Id.* at 130, 217–19. Heilweil himself realized that the value of the machines was an issue. Tr. at 130. He set out to confirm that the machines were reasonably priced in a number of ways. He asked Mr. Wilensky, a C.P.A. who assisted him in advising clients, to investigate the issue. *Id.* at 131–32. As is discussed in more detail below, among the information discovered by Mr. Wilensky was that the manufacturer of the machines, PI, was a respected and substantial company that was highly positioned in its industry. *Id.* at 132.

Mister Heilweil contacted PI to learn more about the manner in which the machines

---

**36.** Mister Ridley's knowledge of Masters could be traceable back to Mr. Heilweil through Mr. Wil-

ensky, who was Ridley's accountant. *See* Tr. at 182.

were priced, and spoke with the company's vice-president and general counsel. *Id.* at 132, 137; Pls.' Ex. 9. He was told that the machines were priced in a manner consistent with PI's historical pricing methods for its proprietary machines, and requested confirmation in writing. Tr. at 132–34; *see also* Pls.' Exs. 8 & 9. Heilweil received a copy of a letter that PI had addressed to Boylan & Evans, the law firm which provided the tax opinion letter included with the Memorandum. Tr. at 133–34, 156; Pls.' Ex. 4.[37] This letter, which was provided to and reviewed by Messrs. Allison, Dorsey, and Olansky, Tr. at 31–32, 71–72, 92; Jt. sip. ¶ 6, explained that PI's pricing policy was a trade secret, that the machines were priced "in a manner consistent with its historical pricing methods for proprietary machines," and that ECI and PI negotiated at arm's length to reach the price paid by ECI and to agree to ECI's right of first refusal regarding the machines. Pls.' Ex. 4 at 1–2.

The PI letter also represented that the Sentinel EPS Recyclers were "unique and superior to any other product now being marketed." *Id.* at 2. Mister Heilweil investigated whether there were comparable machines. These investigations included discussions with at least one individual in the petrochemical industry who had decided to invest in Masters, discussions with investors who had industry contacts, and probably the discussion with the Dow Chemical officer. Tr. at 152–55. Again, although Mr. Heilweil was not certain of the details of these conversations that had occurred twenty-two years prior to his testimony, he convincingly testified to the fact of these discussions and to his having concluded, as a result, that no other machine could convert polystyrene waste into a commercially usable product. *Id.* at 142, 150. Consistent with the unique nature of the machines, Mr. Heilweil also learned from PI that the company took great pains to protect its trade secrets. *Id.* at 156–57.

Having concluded that there existed no machine on the market that was comparable, Mr. Heilweil verified the reasonableness of the price of the Sentinel EPS Recyclers by other means. He did this by comparing the expected profits from the joint venture, discounted to present value, to the sales price of the machines. *Id.* at 141–42. Mister Heilweil's investigations led him to conclude that the Masters venture was likely to be profitable and that these expected profits made the purchase price of the recycling machines reasonable, and he reported his findings to Messrs. Allison, Dorsey and Olansky. *See id.* at 131–43. He did not obtain a fair market value appraisal of the machines. *Id.* at 156.

Heilweil also testified that he viewed the mark-up in the price ECI charged F & G as "fairly standard" and "very similar to other leveraged leasing transactions." Tr. at 134–35. He explained that various warnings and disclaimers contained in the Memorandum were standard for offerings, and not a particular cause for alarm. *Id.* at 145–46. And while he recognized that the identical $81,250 payments that were to be made each month from PI to Masters, from Masters to F & G, from F & G to ECI, and from ECI to PI seemed odd, Mr. Heilweil received confirmation from attorneys who were knowledgeable of such structured transactions that the circular payments were not "totally unusual within a leveraged lease transaction." *Id.* at 159.[38]

Mister Heilweil investigated the Masters investment opportunity as he would any prospective investment. He does not usually visit companies, but instead considers such factors as "the general business quality attached to that business, the kinds of people who are involved," and its long range prospects. *Id.* at 123–26. He explained that as a general rule investment advisers do not acquire any technical training in, or technical knowledge about, an industry before advising clients whether to invest in a particular business in that industry, but instead investigate

---

**37.** Mister Heilweil had spoken with some attorneys that he knew to obtain background information on Boylan & Evans, and learned it "was a law firm of good reputation." Tr. at 137.

**38.** While Mr. Heilweil could not identify these attorneys due to the passage of time, his testimony was nonetheless credible on this point.

the financial situations of businesses and obtain "some understanding of the environment in which an industry works." *Id.* at 139–40.

### 2. *Wilensky*

Robert Wilensky was asked by Mr. Heilweil to review the Masters Memorandum, and spent "quite a bit of time" analyzing it. Tr. at 167–68. He reported back to Heilweil, and they then divided up the tasks that they would undertake to further investigate the investment opportunity. *Id.* at 168. To investigate the reputation of PI and its financial ability, Mr. Wilensky contacted a partner at Arthur Andersen's Boston office. *Id.* at 169. He learned that PI "had more than a million dollars in equity," was an "honorable company" and was more than forty years old, produced "big, major machines" that were sold to corporate customers such as Mobil Oil Corp., and preserved the proprietary nature of its products. *Id.* at 170, 177. His contact at Arthur Andersen, where he formerly worked and which served as PI's auditors, confirmed that PI's statements concerning its pricing policies were reliable. *Id.* at 177–78. Mister Wilensky also learned that this contact was not aware of machines made by any other company that could take polystyrene waste and both "density" and recycle it into a reusable material. *Id.* at 171, 193–94.

Wilensky further investigated the question of the uniqueness of the Sentinel EPS Recycler, by discussing the machines with clients who themselves had contacts in the oil and plastics industries. Tr. at 171–72, 196–97. One client, Clarence Ridley, knew the president of a company that was using the recycling machines, and had clients in similar industries. *Id.* at 171, 196. Another client was a commodities dealer who knew people with knowledge of oil, plastics, and recycling. *Id.* at 197. He asked these clients to make inquiries and report their findings back to him. *Id.* at 196. From these discussions, and others that Mr. Wilensky could not remember as distinctly, *see id.* at 197, he concluded that there were no machines compara-

ble to the Sentinel EPS Recycler. *Id.* at 171–72, 175, 193–94, 196–97.

Mister Wilensky also obtained information concerning projected oil prices from his commodities dealer client. *Id.* at 197. Wilensky knew that the price of oil was an important factor in the price of plastics and, hence, of the resin pellets for which the recycler's product was to be a substitute. Tr. at 172–73, 198. From articles and projections in circulation in late 1982, he knew that the price of oil was expected to increase, up to as much as $100 per barrel. *Id.* at 173. He concluded that the Masters partnership "could be a profitable venture," and was a smart, sound business investment based on the profit potential. *Id.* at 174, 184. He stressed that he "would not recommend or suggest to somebody that they seriously look at an investment that did not have a profit potential...." *Id.* at 174. He accordingly recommended Masters as an investment to Messrs. Allison and Olansky, as well as to his own father—who followed the advice and invested in the partnership. *Id.* at 182, 184.[39]

Wilensky had also concluded that the machines were properly valued for purposes of calculating the associated tax benefits. *See id.* at 180–81. He based this on his belief that the machines were unique and proprietary; on PI's reputation as a trustworthy and established company; on PI's representations made both orally and in the letter to Boylan & Evans that the machines were priced consistent with PI's historical pricing policy and as a result of arm's length negotiations; and on the fact that PI's customers for machines that were priced in this manner included major corporations such as Mobil Oil. Tr. at 176–78. He considered the fifteen percent mark-up in the price that ECI charged F & G for the machines to be a "reasonable percentage" under the circumstances, based on his experience as a C.P.A., and not a "red flag" as to the legitimacy of the transaction. *Id.* at 178–79, 202.

Mister Wilensky also believed that the tax benefits proposed in the Masters Memorandum were correct. *Id.* at 184. He based

---

**39.** His advice was indirectly received by Mr. Dorsey through Mr. Heilweil. *See, e.g.,* Tr. at 28, 53, 131, 182.

this on the confirmations he received from tax attorneys or accountants that he and Mr. Heilweil had asked to consider the transaction—including the informal opinion received from Mr. Gregory—as well as the Boylan & Evans tax opinion letter included with the Memorandum. *Id.* at 180–81. He advised Messrs. Olansky and Allison directly on the tax issue. *Id.* at 201. He did not think that the proposed tax benefits were unbelievably large, given the worries at that time of future oil shortages, the government's interest in "promot[ing] conservation, waste management [and the] recycling of items," and the government's policy of using the tax code to create incentives. *Id.* at 180. He also noted that the tax benefits were not a sure thing, as there was the possibility of recapture if the machines were not used for the requisite time period. Tr. at 206.

In total, Mr. Wilensky spent between 100 and 200 hours investigating the Masters opportunity, and he "probably spent more time investigating this than any other company" he had investigated for clients. *Id.* at 192, 206–07. One reason so much research was conducted was the substantial size of the tax benefits associated with Masters, and the need to confirm the validity of the prices charged for the machines. *Id.* at 206. Much of his investigation involved talking with people who, in turn, were expected to use their contacts to obtain information and report back. *Id.* at 171–72, 196–97. Mister Wilensky placed this investigation in context by contrasting the current access to information via the Internet with the efforts needed to obtain information back in 1982. *Id.* at 171–72. He received fees from Mr. Heilweil for his work, which came out of the fees the latter received from Masters, and he disclosed these fees to the clients. *Id.* at 144–45, 182–83.

Mister Wilensky also explained that it was not typical for accountants to restrict their investment advice and analysis to areas in which they have received formal or intensive technical training. Tr. at 185–86. He believed that the cost of engaging an appraiser to value the Sentinel EPS Recycler would "probably [have] cost as much as the investment" did, and thus was not a practical option to confirm the reasonableness of the machine's value. *Id.* at 188. He also viewed the risk warnings in the Memorandum as standard for prospectuses, and not a cause for particular concern. *Id.* at 179.

### 3. Gregory

Cleburne E. Gregory III was asked first by Mr. Dorsey, then by Mr. Heilweil, for his opinion of the tax consequences of an investment in Masters. *Id.* at 34, 215, 218–19. He spent up to four hours reviewing the Memorandum, including the appended tax opinion letter. *Id.* at 215, 220. He provided his assessment orally in three conversations— one with Mr. Dorsey and Mr. Jack Clark, a late client of Mr. Dorsey's; one just with Mr. Dorsey; and one with Mr. Heilweil. *Id.* at 220. Mister Gregory was of the opinion "that the prospectus made a good case for compliance" with various tax code rules concerning partnership classification and the eligibility of the property for the tax credits. Tr. at 216. He reported to Mr. Dorsey and Mr. Heilweil that he believed that the conclusions contained in the tax opinion letter were "technically correct," that the transactions were properly structured to receive the tax treatment described in that letter, and that he "didn't see any major technical flaws" with the Masters transactions. *Id.* at 217–19. His one "caveat" was that the tax benefits were directly dependent on the value of the machines, and in his review he had "no way of determining ... how much the machine was worth." *Id.* at 216–19, 225.

Mister Gregory provided no formal or written opinion, and charged no fee for his review of the Masters material. *Id.* at 220, 224. While he did not advise Mr. Dorsey to invest in Masters or assist in Dorsey's tax return preparation, he also did not warn Dorsey or Mr. Heilweil against investing in Masters. *Id.* at 224–25. Gregory did not view the size of the tax benefits proposed as very unusual or impossible. Tr. at 222. Although the tax savings were larger than the amounts initially contributed by investors, Mr. Gregory explained that the tax basis of property which has been acquired through financing in a leveraged transaction can include the associated debt. *Id.* He also be-

lieved that the risk warnings contained in the Memorandum were standard warnings and not at all unusual. *Id.* at 221. It does not appear that Mr. Gregory found any aspect of the Masters transaction to be so unusual as to suggest that the machines were improperly valued.

### 4. *Sidney Olansky*

Sidney Olansky relied on the advice of Mr. Heilweil, his investment adviser, and Mr. Wilensky, his long-time accountant, in making the Masters investment. Jt. Stip. ¶¶ 3, 5; *see also* Tr. at 143–44, 151, 182, 201. He had no experience or training in plastics, and no expertise to determine if the Sentinel EPS Recyclers could be utilized as stated in the Memorandum or to determine if the machines' purchase or rental prices were fair. Jt. Stip. ¶ 4. Doctor Olansky reviewed the Memorandum, including the attached opinions of Professors Burstein and Ulanoff and the Boylan & Evans tax opinion letter. *Id.* ¶ 6. He also reviewed the letter from PI to Boylan & Evans concerning PI's pricing policies. *Id.* Olansky never obtained a fair market value appraisal of the Sentinel EPS Recyclers. *Id.* ¶ 8.

The Court concludes that the Olanskys acted as would reasonable and ordinarily prudent persons in claiming the tax deductions and credits that they believed resulted from Dr. Olansky's investment in the Masters partnership, and have proven that the negligence penalty under the former 26 U.S.C. § 6653(a) should not have been imposed on them. Doctor Olansky properly relied on the professional advice of Messrs. Heilweil and Wilensky in this matter. These advisers reasonably and adequately investigated the Masters investment opportunity. They verified positive reputations of the manufacturer of the machines and the law firm which provided the tax opinion letter for the Memorandum. Tr. at 137, 169–70, 177–78. Their research seemed to confirm the claim, contained in the Memorandum, that the recycling machines were unique in the ability to convert foam polystyrene waste into commercially marketable resin pellets. *Id.* at 142, 150, 171–72, 175, 193–94, 196–97; *see also* Pls.' Ex. 1 at 10, F–21, F–23–24. Mister Wilensky convincingly testified that he invested over one hundred hours in investigating the Masters investment opportunity. Tr. at 192, 206–07.

Heilweil properly relied on the opinion of Mr. Gregory that the Masters transactions were structured in a technically correct manner to achieve the proposed tax benefits, provided that the machines were reasonably valued. *Id.* at 130, 217–19.[40] And Wilensky properly considered the views expressed in the tax opinion letter that was appended to the Memorandum, even though this opinion was provided for the general partner promoting the investment. *Id.* at 181; *see Chamberlain*, 66 F.3d at 733 (holding taxpayer reasonably relied on advice of partnership accountant who, in turn, relied on opinion letter from the offering materials).[41] Having received written confirmation that PI had priced the machines consistent with its historical pricing policy for its proprietary machines and as a result of arm's length bargaining with ECI, and believing the machines to be unique proprietary products of PI, Messrs. Heilweil and Wilensky concluded that the machines were reasonably valued. Tr. at 133–34, 176–78. Mister Heilweil confirmed this conclusion by comparing the present value of the expected joint venture profits to the purchase price of the machines. *Id.* at 141–42. Mister Wilensky concluded that the tax benefits proposed in the Memorandum were available to investors. *Id.* at 180.

Heilweil and Wilensky's research led them to conclude that Masters would be a profitable investment, and that the Memorandum's financial projections were reasonable given the expectations of rising oil prices and manufacturers' increasing need to dispose of cumbersome steam chest molded expanded polystyrene waste. *Id.* at 136–38, 172–74,

---

**40.** It is of no significance that Mr. Gregory did not charge a fee for his review of the Masters Memorandum. *See Klein*, 94 F.Supp.2d at 852.

**41.** The Tax Court had previously determined that the accountant relied on the opinion letter. *See Chamberlain*, 67 T.C.M. at 2993–2.

184.[42]  As was discussed in Part II. A., *supra*, the advisers' lack of technical training or expertise in the areas of plastics or plastic recycling does not make it unreasonable to rely on their investment advice. And indeed, the only evidence in the record on the point confirms that it is neither typical nor standard in the investment advising profession for advisers to restrict their advice to industries concerning which they possess some special technical training or technical knowledge. *Id.* at 139–40, 185–86. The Court does not find the fact that these advisers received a fee from the promoter of Masters to undermine the reasonableness of the Olanskys' reliance on them. Mister Wilensky had a long, preexisting relationship with Dr. Olansky as the latter's accountant, and Mr. Heilweil was his investment adviser. Jt. Stip. ¶¶ 3, 5; Tr. at 151, 182. Under the circumstances, Dr. Olansky could reasonably expect loyal, honest service from these reputable advisers. *See Anderson*, 62 F.3d at 1271; *Klein*, 94 F.Supp.2d at 850; *Zidanich*, 70 T.C.M. at 374.

Doctor Olansky reasonably relied on the advice of Messrs. Heilweil and Wilensky, who viewed Masters as sound investment based on potential profitability. Tr. at 136–37, 173–74. His accountant, Mr. Wilensky, specifically advised that the tax benefits proposed in the Memorandum could be claimed by investors. Tr. at 180, 184, 201–02. Although the Commissioner was ultimately to determine that Masters constituted an abusive tax shelter, the Olanskys were not negligent in claiming tax deductions and credits that were predicated on Masters being a legitimate investment. Unlike the taxpayer in *Conway*, Dr. Olansky received investment advice from professional advisers. *Cf. Conway*, 326 F.3d at 1279 (noting that taxpayer had just a single conversation with an attorney, who provided him an "investment tip," not professional advice). Moreover, also in contrast to *Conway*, Dr. Olansky reviewed the Memorandum, including the appendices. Jt. Stip. ¶ 6; *cf. Conway*, 326 F.3d at 1270, 1279 (noting that taxpayer never received a copy of the offering memorandum or tax law opinion). He could further rely on the tax law

opinion provided by Boylan & Evans, and the reports by the two professors. Concerning the latter, it would have been reasonable for Dr. Olansky to conclude, given Dr. Ulanoff's enthusiasm for the business plan of the joint venture, *see* Pls.' Ex. 1 at F–4–7, and Dr. Burstein's evaluation of the unique capabilities of the Sentinel EPS Recycler, *see id.* at F–21–24, that Masters represented a potentially profitable investment.

The Court does not find the presence of any information contained in Memorandum and its attachments casting sufficient doubts upon the investment as to require any additional investigation on the part of Dr. Olansky. The government raises several arguments in this vein, suggesting "red flags" that it apparently believes render unreasonable the claiming of tax deductions and credits based on Masters. *See, e.g.*, Def.'s Br. at 2, 8–9, 18–19, 24–26; Tr. at 20–21. The most prominent of these regards the value of the Sentinel EPS Recyclers. The possibility that the IRS could challenge the price paid by F & G "as being in excess of the fair market value" was identified in the Memorandum as a tax risk. *See* Pls.' Ex. 1 at 12. The machines' value was discussed in the tax opinion letter, which concluded that the F & G price was the proper basis for the tax credits. *Id.* at E–12. Mister Gregory stated the truism that the tax credit calculations depended on the value of the equipment qualifying for the credits, and while he conceded that he lacked any ability to determine this value, nothing in the record suggests that he saw any particular reason to believe that the machines were overvalued or that he warned they might be overvalued. *See* Tr. at 215–25.

The government argues that, since the value of the recycling machines was crucial to determining the appropriate amount of tax credits to be claimed, that the taxpayers should be faulted for not having obtained an appraisal of the machines' fair market value. Def.'s Br. at 26. But the credible testimony of Mr. Wilensky was that such an appraisal was likely to cost as much as the investment

---

42. These financial projections indicated that the per unit value of expected net joint venture prof-

its, in nominal terms, exceeded the projected tax benefits. Pls.' Ex. 1 at D–3–4.

in Masters, Tr. at 188, and persuasive authorities have rejected the imposition of such a burdensome and costly requirement upon taxpayers. *See Heasley*, 902 F.2d at 383–84; *Klein*, 94 F.Supp.2d at 851. Indeed, the notion that individual taxpayers would have to hire economic experts to assist them in the preparation of their tax returns does not implicate the unreasonableness of taxpayers so much as the unreasonable expectations of the government. After investigating the existence of comparable machines, and having received written confirmation of the unique proprietary nature of the recyclers and of the manner in which they were priced, it was proper for the Olanskys' advisers to have verified the value by scrutinizing the projected profit stream. *See, e.g.*, Tr. at 140–42.[43] In this regard, it is worth noting that the financial projections could have been viewed as conservative, as they proceeded from an assumption that the resin pellets produced by the joint venture would sell at a price that was eight cents below the low end of the range of prices at that time. *See* Pls.' Ex. 1 at 9, 23, D–5, F–7.

Another alleged "red flag" is the identical $81,250 monthly payment that would circulate, pursuant to the Masters business plan, among PI, Masters, F & G, and ECI. *See* Tr. at 20; Def.'s Br. at 20; Pls.' Ex. 1 at 20–22. Although the government fails to elaborate on this point, it seems the argument is that since Masters would be receiving a joint venture fee of $81,250 each month from PI, which was exactly enough to cover the monthly lease payments for the machines, the partnership was only, in effect, paying $650,000 for machines it valued at $7 million. Thus, the government appears to suggest that the investors should have suspected that the machines were not worth the price paid by F & G. But unlike in *Provizer*, where the Tax Court considered evidence that there existed " 'offset agreements' " that rendered

the payments "bookkeeping entries only," 63 T.C.M. at 2551, no such evidence has been presented at trial. The Masters Memorandum to the contrary indicated that the payments were actually to be made each month, as otherwise the six-year moratorium on collecting overdue payments would have been unnecessary. *See* Pls.' Ex. 1 at 8, 20–21, B–2.

In any event, the unusual "circular" payments involved in the transaction are not, *per se*, a ground for finding the taxpayers negligent in treating Masters as a legitimate investment, or in claiming tax credits based on the F & G purchase price. On their face, they can be taken to represent something other than a scheme to convert $650,000 into $1.4 million in tax credits. Under the Memorandum's financial projections, the partnership was expected to earn gross profits of $3,830,860 growing from a $0.10 per pound share of the resin pellet sales. *See id.* at 23. This amount was to be received after PI had taken its share of a $0.27 per pound fee, which was to adjust upwards each quarter by fifty percent of the increase in the price of pellets. *See id.* at 22–23. By the simple, back-of-the-envelope calculation of multiplying the partnership's gross profits by 2.7, it can be seen that PI was expected to share in at least $10,343,322. Thus, the "circular" payments could have instead been a method by which PI could contribute some ninety percent of the value of the machines, in return for this larger share of the joint venture profits.[44]

The government also contends that the investors should have viewed the proposed tax benefits, nearly twice the size of the amounts invested, as "too good to be true." Def.'s Br. at 25. But as we have just seen, the taxpayers could also have viewed the price of the benefits as including their pro

43. The government suggests that the taxpayers may not rely on the letter from PI to Boylan & Evans because their interests in Masters were purchased prior to the handwritten date (December 29, 1982) on the letter. Def's Br. at 8–9 n. 3; *see* Pls.' Ex. 4 at 1. But Mr. Dorsey testified credibly that he had seen a copy of the letter before he invested in Masters, Tr. at 71, and, in any event, the ultimate significance of this letter is that it was seen before the taxpayers claimed

the deductions and credits on their tax returns—and this point is not controverted.

44. The Court notes that this nominal stream of revenue based on the "reimbursed costs" portion of the joint venture profits also exceeded the nominal total of joint venture fees owed by PI, which was $8,612,500. *See* Pls.' Ex. 1 at 22.

rata share of the $10 million in future joint venture profits that were expected to be paid to PI and RPI. Moreover, even in the absence of a determination that the Masters transactions constituted an abusive tax shelter, these tax benefits were not a sure thing. As the Memorandum indicated, and Mr. Wilensky testified, there existed the possibility that the credits would be recaptured if the partnership failed and the machines were not used for the appropriate amount of time. Pls.' Ex. 1 at 13, E–10–11; Tr. at 206. And as plaintiffs have pointed out, see Pls.' Br. at 38–41, there is no *per se* rule that tax benefits of a certain size are presumed impossible. The Fifth Circuit in *Chamberlain* and *Durrett* found the taxpayers not negligent in claiming tax losses that were eight to ten times the size of their investments, and which resulted in tax benefits that were more than twice the investments. *See Durrett*, 67 T.C.M at 2742 (noting ratio of losses to payments "between 8:1 and 10:1"), *rev'd*, 71 F.3d at 517–18; *Chamberlain*, 67 T.C.M. at 2993–3–94 (showing taxpayer claimed $29,000 refund based on a $14,000 investment and finding "the ratio of the tax losses compared with payments was huge, between 8:1 and 10:1"), *rev'd*, 66 F.3d at 733. Recognizing that the tax code is used by the Congress to provide incentives for the furthering of its preferred policy choices, see Tr. at 180, the Court cannot find the taxpayers to have acted unreasonably in not being alarmed by tax benefits of the size proposed by the Masters partnership.[45]

The government also argues that ECI's $920,000 mark-up in the price it charged F & G for the machines, over the price it paid PI for them, see Pls.' Ex. 1 at 20, "should have alerted the plaintiffs to the need for close scrutiny." Def.'s Br. at 26. But Mr. Wilensky testified that this mark-up of fifteen percent was reasonable, in his experience. Tr. at 178–79, 202. An explanation for the mark-up can be found in the Memorandum, which stated that ECI had obtained a right of first refusal and that the machines were developed for ECI's purposes. Pls.' Ex. 1 at 8, 10;

see also Pls.' Ex. 4 at 1. And in any event, the corresponding mark-up in the *Provizer* case did not appear to be of any significance to the determination that the Clearwater partnership represented an abusive tax shelter. *See Provizer*, 63 T.C.M. at 2548–52. It strikes the Court as unduly severe, perhaps even arbitrary, that the Commissioner would have completely eliminated tax credits and deductions on the basis that equipment was overvalued by fifteen percent, and the Court will not speculate that this was the case for these plaintiffs. The taxpayers cannot be negligent in failing to be suspicious of this mark-up, when the mark-up was never the ground for an abusive tax shelter determination.

The defendant also argues that the plaintiffs must have been negligent in not discovering that the recycling machines were priced by PI "way above the actual market price." Def.'s Br. at 19 n. 6. On this topic, it is worth remembering that the settlement in *Masters* merely reduced to zero the losses and the basis for the investment and energy tax credits. *See* Def.'s Ex. 5 at 2. It did not result in any determination as to the actual value of the Sentinel EPS Recyclers, nor did it adjudicate the issue of whether this actual value could have reasonably been discovered by taxpayers. *See id.* The government suggests that the Court should take into account the Tax Court's valuation of a different machine (the Sentinel EPE Recycler), designed to process a different material, determined in cases not involving Masters or the plaintiffs. Def.'s Br. at 19 n. 6. But these factual determinations do not fall in the category of matters of which a court may take judicial notice, see Fed.R.Evid. 201(b), nor can collateral estoppel principles apply. *Cf. Arkla, Inc. v. United States*, 37 F.3d 621, 624 (Fed.Cir. 1994) (explaining that collateral estoppel applies only when, *inter alia*, the party being estopped "had a full and fair opportunity to litigate the issue in the first action"). The Court has determined that the efforts of plaintiffs' advisers to confirm the value of the

---

45. If tax benefits that are twice the amount invested are "too good to be true," then one wonders what one would call tax penalties and interest, such as that imposed on the taxpayers in

these cases, which range from nearly eight to more than ten times the amount invested. *See* Def.'s Exs. 1–3.

machines were reasonable under the circumstances, and no rebuttal evidence appears in the record.

Finally, the government also contends that the various warnings of business and tax risk made it unreasonable for the taxpayers to claim the deductions and credits from the Masters investment. *See* Def's Br. at 5. But these warnings are standard for offerings, and cannot be viewed as "red flags" raising the standard of care or requiring any greater amount of investigation on the part of the investors or their advisers. *See* Tr. at 42–44, 93–94, 179, 220–21; *see also Klein*, 94 F.Supp.2d at 853. The Court concludes that Dr. Olansky and his advisers reasonably investigated the Masters investment opportunity, and that the Olanskys have proven they were not negligent in claiming tax deductions and credits based on Dr. Olansky's investment in Masters.

### 5. James E. Dorsey

James Dorsey had learned of the Masters partnership opportunity from Mr. Heilweil, a friend and former colleague whom he considered to be brilliant. Tr. at 26. Mister Dorsey described himself as a "long-ball hitter" with respect to the types of investments he makes—he typically looks for opportunities to make 20:1 or 50:1 returns on his investment. *Id.* at 24, 30. Dorsey had no training in plastic recycling, *id.* at 50, but in the 1980s he was interested in the oil industry and in recycling opportunities, and invested in oil companies and in a biomass waste business. *Id.* at 24–25. At the time that Heilweil brought Masters to Mr. Dorsey's attention, Dorsey was aware that the disposing of foam plastic waste was an increasing problem. *Id.* at 27, 30. He received the Masters Memorandum from Heilweil, spent much time reviewing it, and then met several times with Wilensky and Heilweil to discuss the partnership. *Id.* at 27–31, 50–51. He was particularly interested in learning if the Sentinel EPS Recyclers would work and thus relieve landfills of the recycled materials. Tr. at 30.

Mister Dorsey discussed the issue of the valuation of the machines with Heilweil, who had reported to him that PI was an established company that was looking to go public.

*Id.* at 31. Dorsey took comfort in that report, and in the PI letter to Boylan & Evans regarding PI's pricing methodology for proprietary machines. *Id.* at 31–33. Dorsey had a "very strong recollection" that he had seen the proprietary pricing letter before he invested in Masters. *Id.* at 72. He asked Mr. Gregory to review the Memorandum and, in particular, the tax opinion letter. *Id.* at 33–35. Gregory orally informed him, in two separate discussions, that the tax opinion's conclusions as to the tax treatment of an investment in Masters were technically correct from a legal standpoint, but that he had no way of determining the value of the machines. *Id.* at 35, 216–19. To confirm the value of the machines, Mr. Dorsey derived a capitalization rate by comparing the price F & G paid for the machines to the projected earnings, and he concluded that the price was reasonable. Tr. at 36–37, 59–60. He also concluded that the projected earnings were reasonable, as they were based on the price of pellets being at least $0.37 per pound, and they were selling for $0.45 per pound at the time. *Id.* at 36.

Dorsey discussed with Messrs. Heilweil and Wilensky the tax consequences and profit potential of investing in Masters, and learned the results of their investigations into the partnership. *Id.* at 37, 45–46, 142–43, 181–82. Based on their research, as well as his own consideration of the Memorandum and attached documents, Mr. Dorsey concluded that Masters was a potentially profitable investment. *Id.* at 36. He convincingly testified that he was hoping to earn a greater than two-to-one return on the investment, consistent with his investing goals. *Id.* at 24, 27, 30, 37. Mister Dorsey had learned from Mr. Heilweil that some of the recycling machines made by PI had already been placed at the corporate plants of end users, and that a major Japanese company was going to use one or two of the Masters machines. *Id.* at 45, 65–66, 70. Mister Dorsey did not view the size of the tax benefits associated with the Masters investment to be suspiciously large, based on his general knowledge of the incentives provided by the tax code. Tr. at 38–42. He also believed that the disclaimers

contained in the Memorandum were standard for investment offerings. *Id.* at 43–44.

The Court concludes that the Dorseys acted as would reasonable and ordinarily prudent persons in claiming the tax deductions and credits that they believed resulted from Mr. Dorsey's investment in the Masters partnership, and have proven that the negligence penalty under the former 26 U.S.C. § 6653(a) should not have been imposed on them. Mister Dorsey properly relied on the professional advice of Mr. Heilweil and Heilweil's adviser, Mr. Wilensky. As was discussed above in the context of Dr. Olansky, these advisers reasonably and adequately investigated the Masters investment opportunity. While Mr. Dorsey might, perhaps, be held to a higher standard of care as a sophisticated investor, the Court concludes that Dorsey's own consideration of the Masters partnership's business potential and tax consequences met this higher standard. Mister Dorsey on his own consulted a tax adviser, Mr. Gregory, who confirmed that the tax treatment described in the Memorandum and the tax opinion letter was technically correct, and it was reasonable for Dorsey to rely on this informal opinion. *Id.* at 33–35, 216–20.

To fill in the one open variable in Mr. Gregory's opinion, Mr. Dorsey reviewed the financial projections and performed his own calculations to confirm that the price to be paid by F & G for the machines was reasonable. *Id.* at 36–37, 59–60. The Court found Mr. Dorsey's testimony highly credible regarding his expectation that the Masters investment could be very profitable and his early 1980s interest in recycling opportunities. And the fact that Messrs. Heilweil and Wilensky received a fee from the promoter of Masters does not undermine the reasonableness of the Dorseys' reliance on them. Heilweil was a trusted friend of Mr. Dorsey for many years, someone he regarded as highly intelligent and the possessor of a good reputation as an investment adviser. *Id.* at 26, 52, 84, 219. Dorsey knew that Mr. Heilweil thought highly of Wilensky and "had a lot of confidence in" him, and also was aware that Wilensky had advised his own father to invest in Masters. *Id.* at 28, 53. Under the circumstances, Mr. Dorsey could reasonably expect that these advisers would be loyal to his interests. *See Anderson,* 62 F.3d at 1271; *Klein,* 94 F.Supp.2d at 850. The Court rejects the government's "red flag" arguments, for the reasons explained above regarding Dr. Olansky. The Court concludes that Mr. Dorsey and his advisers reasonably investigated the Masters investment opportunity, and that the Dorseys have proven they were not negligent in claiming tax deductions and credits based on Mr. Dorsey's investment in Masters.

#### 6. J. Thomas Allison III

J. Thomas Allison received a copy of the Masters Memorandum from Mr. Heilweil, who he met through either Mr. Dorsey or Clarence Ridley. Tr. at 80. Although Mr. Allison had no training in plastics recycling or technical knowledge concerning polystyrene foam, he had some experience with recycling plastic and styrofoam packaging from his past work at Coca–Cola and his consulting work with McDonald's and Six Flags. *Id.,* at 76–78. After reading the Memorandum, Mr. Allison visited the library at Georgia Tech and the Atlanta Public Library to read articles from magazines, plastics trade publications, and technical publications concerning plastics, recycling, and the oil industry. *Id.* at 81–84, 86; *see also* Pls.' Ex. 5 (containing some of the articles Allison photocopied). He then met with with Messrs. Heilweil and Wilensky, and learned of their research into the Masters opportunity. Tr. at 84–85, 89–92.

Mister Allison learned from his research and the research of his advisers that the consensus was that oil prices would continue to rise, up to $100 per barrel, and that the problem of disposing of plastic waste would increasingly trouble corporations and communities. *Id.* at 82–84, 86. Allison knew that the price of oil affected the price of plastics, and he was enthusiastic about the business prospects for Masters. *Id.* at 89, 101. At the time, he was looking for investments that would generate a stream of future income to pay for the education of his children, who were still very young. *Id.* at 82, 86–87. He reviewed the financial projections from the Memorandum, and discussed them

with Messrs. Heilweil and Wilensky. *Id.* at 90–92. They agreed that the projections were reasonable. *Id.* at 91–92. He had three meetings and at least a half-dozen telephone conferences with Heilweil to discuss Masters. Tr. at 99. He learned from Heilweil and Wilensky that agreements were made with large companies such as Honda to be the end users of the recycling machines, that PI was an established company, and that his advisers believed Masters would be a profitable investment. *Id.* at 85, 91, 108, 131–43, 182, 184. Mister Allison also learned that Wilensky had advised his own father to invest in Masters. *Id.* at 85.

Allison concluded, based on the expected income stream, that the Sentinel EPS Recyclers were reasonably priced. *Id.* at 90–93. He believed, based on PI's representations, that the machines represented new technology containing PI's protected trade secrets, and thus thought that the only way to confirm their value was to consider the expected income stream. *Id.* at 107–08. Before investing he was shown a copy of the PI letter to Boylan & Evans concerning its proprietary pricing methods, and he took it as some "comfort," but had already concluded that the price of the machines was reasonable. *Id.* at 92–93. Mister Allison also constructed a spreadsheet to calculate the expected profits at different levels of oil prices, and decided based on this, and his knowledge of expected oil price trends, that the Masters investment was sound. Tr. at 100–01.

Mister Allison relied on the advice of Messrs. Heilweil and Wilensky concerning the tax implications of the Masters investment. *Id.* at 95, 143, 201. His accountant also confirmed that an energy tax credit was legitimate. *Id.* at 94. Rather than viewing the tax benefits proposed in the Memorandum as suspicious, Allison believed they represented the government's affirmation of the business plan. *Id.* at 87–88. Based on his experience as an investor, having read several hundred offering documents, he viewed the risk warnings in the Memorandum as "boilerplate" rather than "any particular red flags."

*Id.* at 93–94. He was also familiar with price mark-ups in multi-entity transactions, which he had seen on occasion. *Id.* at 117.

The Court concludes that the Allisons acted as would reasonable and ordinarily prudent persons in claiming the tax deductions and credits that they believed resulted from Mr. Allison's investment in the Masters partnership, and have proven that the negligence penalty under the former 26 U.S.C. § 6653(a) should not have been imposed on them. Mister Allison properly relied on the professional advice of Messrs. Heilweil and Wilensky. Again, as the Court discussed above with regard to Dr. Olansky, these advisers reasonably and adequately investigated the Masters investment opportunity. While Mr. Allison, with an M.B.A., a corporate background, and extensive investing experience might be held to the higher standard of care of a sophisticated investor, the Court concludes that Allison's own consideration of the Masters partnership's business potential and tax consequences met this higher standard.

In addition to reviewing the Memorandum, Allison conducted his own research into the expected oil prices, the impact of oil prices on plastic manufacturing, the problems of plastic disposal, and the potential for plastics recycling. At trial, he produced copies of "a small portion" of his research, more than a dozen of the articles he reviewed—including a *Wall Street Journal* article on the impact of the oil crisis on the plastics industry and several articles from technical and trade publications such as *Modern Plastics* and *Chemical Week. See* Pls.' Ex. 5; Tr. at 82–83. One article particularly discussed the potential for recycling polystyrene scrap. *See* Pls.' Ex. 5 at 26–28.[46] Mister Allison also carefully reviewed and scrutinized the Masters financial projections, and performed his own calculations to assess the partnership's profit potential and to confirm the reasonableness of the price paid for the recycling machines. Tr. at 90–93, 100–01, 107–08. And Allison convincingly testified that his investment goal was to generate income to pay for the education of

---

46. J.L. McCurdy, *Mass Polymerization of Styrene: Route to Economy and Efficiency,* MODERN PLAS-

TICS, September 1979, at 107.

his children, and believed that Masters would be a very profitable venture. *Id.* at 82, 86–87, 89.

Allison could reasonably rely on the advice of Messrs. Heilweil and Wilensky, despite the fee they received from Masters. He knew that "they had built a good reputation" as investment advisers, and that their clients were reputable people whose opinions and intelligence were respected by Allison. Tr. at 84. Mister Allison's good friend from business school, Mr. Ridley, was among the people who introduced Allison to Heilweil and Wilensky. Tr. at 81. Under the circumstances, Allison could reasonably expect that these advisers would be loyal to his interests. *See Anderson,* 62 F.3d at 1271; *Klein,* 94 F.Supp.2d at 850. The Court rejects the government's "red flag" arguments, again for the reasons explained above regarding Dr. Olansky. The Court concludes that Mr. Allison and his advisers reasonably investigated the Masters investment opportunity, and that the Allisons have proven they were not negligent in claiming tax deductions and credits based on Mr. Allison's investment in Masters.

## III. CONCLUSION

For the reasons stated above, the taxpayers in each of the three cases tried before the Court—Sidney and Marian Olansky (case no. 98–718T), J. Thomas and Rebecca S. Allison (case no. 99–419T), and James E. and Maurine M. Dorsey (case no. 99–726T)—have proven that they were not negligent in claiming the tax deductions and credits relating to their respective investments in Masters Recycling Associates. Accordingly, they are each entitled to a refund of the penalties imposed upon them under what was then section 6653(a) of the Internal Revenue Code. The parties in each of the three cases shall submit, on or by Friday, March 28, 2008, a joint stipulation setting forth the amount of judgment to be entered in their respective cases.

**IT IS SO ORDERED.**

